113 N.J. Super. 193 (1971)
273 A.2d 383
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WALLACE J. HEGEL AND MICHAEL AMICO, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 13, 1970.
Decided January 28, 1971.
*194 Before Judges GOLDMANN, LEONARD and MOUNTAIN.
Mr. Michael F. Riccardelli argued the cause for appellants (Mr. Barry H. Evenchick, attorney and on the brief).
Mr. George N. Pappas, Assistant Prosecutor, argued the cause for respondent (Mr. Joseph P. Lordi, Essex County Prosecutor, attorney).
*195 The opinion of the court was delivered by MOUNTAIN, J.A.D.
Defendants were jointly indicted and tried for so-called felony murder. They appeal from convictions following jury verdicts of guilty of first degree murder with recommendation of life imprisonment. The victim's death allegedly resulted from an assault by defendant, Amico, committed while attempting to rob. Hegel was found guilty as an aiding and abetting participant.
A recital of the facts is necessary to an understanding of the legal issues involved.
On Veterans Day, November 11, 1968, sometime in the forenoon, the two defendants chanced to meet in a tavern in Paterson. Amico said he was going to drive to Newark on a personal errand and Hegel asked if he might accompany him in order to meet his girl friend, Alice LePree. Upon Amico agreeing, Hegel telephoned Alice, who lived in South Orange. He had apparently called her earlier but she had then been still asleep. This time he spoke to her and it was agreed that they would meet a little later in Newark.
According to Amico's testimony  Hegel did not take the stand  they then drove to a tavern in South Orange and while there Hegel telephoned Alice for the third time. They agreed to meet in Newark between 1:30 and 2:00 P.M. The call appears to have been made about 12:30. The proprietor, as well as a police officer who knew Hegel and happened to be in the bar, both corroborated his presence in the tavern and remembered that he had phoned. This telephone call is of especial importance in view of the argument put forward by the State that Hegel lured Alice away from her home at a particular time so that she would be absent when defendants arrived with intent to rob.
Alice first testified that upon the occasion of this call, Hegel said he was in Paterson. She at least partially recanted on cross-examination and admitted that he might not have said this, and that she might have assumed he was still at the bar in Paterson due to the noise of clinking glasses in the background.
*196 According to Amico, he and Hegel then left the South Orange tavern and drove to Newark so that he might carry out his errand at the office of the Veterans Administration. Arriving at the office and finding it closed because of the holiday, they then quickly returned to South Orange in an effort to head off Alice before she left for Newark. Upon coming into the neighborhood where Alice lived, they stopped and consulted. Alice lived with her grandmother, Josephine LePree, her grandfather and two aunts. She had been dating Hegel for about seven months and to her grandmother, at least, he was not an acceptable swain. She often referred to him as "that pest." She apparently harbored similar feelings about any young man who was attentive to her granddaughter. Pointing this out to Amico, Hegel suggested that he, Amico, approach the house to see whether Alice might still be there, since the grandmother did not know Amico, while Hegel drove to the bus stop where Alice might be expected to take a bus for Newark. Agreeing to this proposal, Amico alighted and started walking toward the house.
At this point both defendants were seen by a witness, Margaret Spacek, who lived near Alice's home. She saw the car stop, saw Amico get out and cross the street toward her house and saw the car drive away. She was standing on the porch and at first thought Amico was someone she knew. Before realizing her error she said "hello" and then quickly perceived her mistake. She noted that Amico continued to walk in a normal, unhurried manner in the direction of Alice's residence. He moved out of sight.
No one except Amico testified as to what immediately followed. He said that he proceeded to the LaPree home and stood about hoping Alice would see him and come out. They were well known to one another and Alice had been told that Hegel was in his company. As a matter of fact, Alice had already left. At this point Hegel returned, still driving Amico's car. He indicated by a manual sign that he had failed to find Alice at the bus depot. Amico, according to his own testimony, in order to move things along, walked *197 up the LePree driveway to the back of the house and knocked at the door. A person, who proved to be Josephine LePree, asked who was there. Anxious to learn whether Alice had yet left, and believing he might be turned away if he identified himself, Amico said he was "from the Public Service." Mrs. LePree opened the door and upon his inquiring whether Alice was at home and recognizing that he was not the person he had said he was, called him a "bum," grasped a broom or some similar object and appeared about to strike him. He beat a hasty retreat, walked back down the driveway, met Hegel and recounted the episode that had just occurred. They both then ran back to the parked car and left. Returning to Newark they met Alice, who was annoyed at having been kept waiting about 30 minutes. All three were together the rest of the afternoon and early evening. So much for the testimony of Amico.
It so happened that as he was leaving the LePree home, walking back down the driveway, Amico was seen by Michelle Gelinas, age 13, who lived in the house next door. She testified that he was walking in a calm and unhurried fashion, occasionally looking behind him. She saw him reach the sidewalk and turn down the street before he moved out of her line of vision.
About two minutes after Amico had disappeared, Josephine LePree was heard at the Gelinas' back door. Mrs. Claire Gelinas and her daughters, France and Michelle, were at home. Mrs. LePree entered the kitchen and proceeded into the living room. She was distraught, upset and frightened. There was a bloody mark on her check. She announced that she was dying, that a robber was in her house and that she needed help. Her appearance alarmed Mrs. Gelinas who asked her to sit down, directed her daughter to prepare a cup of tea and at once telephoned the police.
The conversation between the officer who answered the telephone at the police station and Mrs. Gelinas and Mrs. LePree, who alternately spoke at their end of the line, was recorded on tape by a machine at headquarters. The recording *198 was played back to us on the oral argument of this case and a written transcription forms part of the record. While the conversation was in progress, Mrs. LePree fainted. She never regained consciousness and died very shortly thereafter. Two points stand out in this conversation: Mrs. LePree knew she was dying and she herself never mentioned any robbery or any robber. Mrs. Gelinas, however, did. She repeated that a robber, who had slapped Mrs. LePree and pushed her to the ground, was in the house. Furthermore, at the trial, each of the three members of the Gelinas family testified that Mrs. LePree had said (obviously, not during the recording) she had been robbed or that a robber had entered her house.
Josephine LePree, at the time of her death, was 77 years old and grossly overweight. She had had two previous heart attacks  myocardial occlusions. The autopsy examination disclosed her heart to have been enlarged and scarred. The coronary arteries were arteriosclerotic.
The State's case is one of felony murder. The applicable statute provides that,
If any person, in committing or attempting to commit * * * robbery * * * kills another, or if the death of anyone ensues from the committing or attempting to commit any such crime or act * * * then such person so killing is guilty of murder. [N.J.S.A. 2A:113-1]
To sustain the conviction there must have been a finding that Mrs. LePree's death ensued from defendant's attempt to commit robbery. The only evidence that there was an attempt to commit robbery is found in the statements of Mrs. LePree as recalled by Mrs. Gelinas and her two daughters.
These statements were admitted, over defense counsel's objection, as dying declarations  a well recognized exception to the hearsay rule. Evidence Rule 63 (5) provides that,
In a criminal proceeding, a statement made by a victim unavailable as a witness because of his death is admissible if it was made voluntarily and in good faith and while the declarant was conscious of his impending death.
*199 Upon a preliminary examination out of the presence of the jury the trial judge found that Mrs. LePree was conscious of impending death. Such a finding was in every way justified. There was also no doubt that the statements were made voluntarily, nor is there any reason to impugn the good faith of the declarant. Thus the prerequisites to admissibility as set forth in the rule appear to have been met.
But even though the circumstances surrounding the dying declaration may be such as to meet the requirements of the rule, for the statement to be received in evidence it must be otherwise evidentially admissible. Such, we think, was not the case here.
The words of the victim, that she had been robbed or that a robber was in her house, allegedly repeated several times, amounted to an assertion of opinion only. They were a conclusion. Ordinarily such a statement is inadmissible.
In a number of cases the courts have had under consideration the question of the admissibility of statements characterizing the act of the accused as criminal, or as importing a degree of crime, such as declarations to the effect that the declarant had been "murdered," "butchered," "assassinated," "robbed" or "waylaid." Although the admissibility of declarations involving the use of such terms is often controlled by the surrounding circumstances, such declarations are generally and ordinarily held to be inadmissible as statements of opinion or as conclusions. [1 Wharton, Criminal Evidence (12th ed. 1957), § 311 at 725]
Opinions in dying declarations are inadmissible. It is indispensable that the dying declaration should consist solely of facts, and not of conclusions, mental impressions or opinions. [Underhill, Criminal Evidence (5th ed. 1956), § 292 at 735]
Thus, a statement that would be inadmissible as a conclusion, were the declarant living and present to testify, is not admissible merely because the declarant's death was imminent. Had Mrs. LePree been alive and able to give evidence she would, of course, have been allowed to state the facts touching the alleged crime but she would not have been permitted to make a general conclusional statement that a particular crime, such as robbery, had been committed. Annotations: "Dying *200 declarations involving an opinion or conclusion," 25 A.L.R. 1370 (1923), 63 A.L.R. 567 (1929); "Admissibility in criminal trial of dying declarations involving an asserted opinion or conclusion," 86 A.L.R.2d 905 (1962). Although, as an examination of the cases collected in the foregoing annotations will reveal, the authorities are somewhat divided, the majority rule supports a finding of inadmissibility where the utterance narrates no fact but states merely a conclusion.
There is, however, a definitely discernible trend toward a relaxation of this rule of exclusion in favor of a policy of admissibility where circumstances attending the utterance lend support to the validity of the opinion or conclusion expressed by the decedent. This trend is clearly attributable to the influence of Professor Wigmore, who thought the opinion rule found no place in a consideration of the admissibility of dying declarations.
The Opinion rule has no application to dying declarations. The theory of that rule is that, wherever the witness can state specifically the detailed facts observed by him, the inferences to be drawn from them can equally well be drawn by the jury, so that the witness' inferences become superfluous. Now, since the declarant is here deceased, it is no longer possible to obtain from him by questions any more detailed data than his statement may contain, and hence his inferences are not in this instance superfluous, but are indispensable.
Nevertheless, most Courts accept the Opinion rule as applicable. [5 Wigmore, Evidence (3rd ed. 1940), § 1447 at 247]
As examples of courts that have accepted Wigmore's position, see Pendleton v. Commonwealth, 131 Va. 676, 109 S.E. 201 (Sup. Ct. App. 1921); Commonwealth v. Knable, 369 Pa. 171, 85 A. 2d 114 (Sup. Ct. 1952); Connor v. State, 225 Md. 543, 171 A.2d 699 (Ct. App. 1961). In adopting this view, however, the courts which have done so have been careful to note that a dying declaration that states an opinion or ultimate conclusion is not under all circumstances automatically admissible. Thus the Pennsylvania Supreme Court in Commonwealth v. Knable, above, while agreeing that
*201 * * * dying declarations which contain inferences and conclusions of the declarant from facts which he knows or observes but does not state may be admissible; and the opinion rule has no application to dying declarations.
nevertheless cautioned that in such instances
* * * all the attendant circumstances should be considered, including the weapon which wounded him, the nature and extent of his injuries, his physical condition, his conduct, and what was said to and by him. [Citations omitted] Whether the attendant facts and circumstances of the case warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind and the credibility, interpretation and weight to be given his statement are for the jury under proper instructions. [85 A.2d at 117]
We agree with this formulation of the rule.
At the trial below the court conducted a preliminary examination out of the presence of the jury to determine whether the dying declaration of Mrs. LePree should be received. This was entirely in accordance with the accepted practice that the admissibility of such a proffered statement shall first be determined by the judge. The court found, as required by Evidence Rule 63(5), that the statement had been made voluntarily, in good faith and in contemplation of imminent death. As already noted, we agree that these findings were correct and soundly based upon evidence in the record.
But nowhere was any thought or attention given to the circumstance that decedent's words stated an opinion and not a fact, that they were conclusional  and that the conclusion pertained directly to an ultimate issue upon which the whole question of innocence or guilt rested. Where such is the case, the preliminary hearing held by the court should include, in addition to testimony supporting or negating the requirements enumerated in the rule, evidence illuminating all relevant circumstances surrounding the utterance, and the trial judge should examine and weigh all such testimony *202 to determine whether, in his sound judgment, the statement of decedent can be received without undue prejudice to the defendant. It must be borne in mind that a dying declaration is often terrible in its consequence and well nigh impossible to counter. It has been described as "devastating" in its impact. State v. Yough, 49 N.J. 587, 598 (1967). Where it takes the form of an opinion or a conclusion it should not be offered to the jury until a preliminary determination has been made by the judge that in light of the totality of all relevant circumstances it can fairly be received without undue prejudice.
A careful reading of the full record in this case satisfies us that had this issue been examined on preliminary hearing, it must, for reasons set forth below, have resulted in a determination to reject the statement.
It will be remembered that Claire Gelinas and each of her two daughters recalled hearing Mrs. LePree say that she had been robbed or that there was a robber in her house. As Mrs. Gelinas was being questioned as to what Mrs. LePree actually said, the following colloquy ensued,
Q Did she indicate to you at that time that she was being robbed?
A No, she don't say she was being robbed. She said there was a robber in my home, un [one] man.
Q But she didn't say she was being robbed?
A No.
Q She did say that there was a robber in her home?
A Yes.
Defense counsel upon this important point invited the court to compare Mrs. Gelinas' testimony at the trial with her earlier statement given before a municipal magistrate. Upon the former occasion, when asked, "Did she [Mrs. LePree] say what the man was doing in her home?" she had replied "No, she said nothing at all." And upon the question being repeated, "She didn't say why the man was in the house at all?", the witness' response had been, "No, no, no."
These remarks at least suggest that Mrs. LePree may have used the word, "robber," merely as an opprobrious epithet. *203 They do not substantiate a conclusion that a robbery was in progress or was being attempted.
Further, as was noted above, no word uttered by Mrs. LePree that was recorded as a part of the telephone conversation to police headquarters referred to a robber or to robbery.
It was generally conceded that there was no evidence of a robbery having been committed.
A commonly expressed justification for including dying declarations among the exceptions to the hearsay rule is that the realization of impeding death supports a strong likelihood of credibility. Here we have no doubt Mrs. LePree thought she was dying. (As previously noted, she was 77 years old and had suffered two previous severe heart attacks.) Indeed she was  understandably  so deeply preoccupied with her physical condition as to have been conscious of little or nothing else. One cannot examine her remarks in the setting and context in which they were uttered without sensing her deep concern for her mortal welfare  a concern so exclusive of all else that it engenders real doubt as to whether her mind came to bear upon any other subject. It was while in this state and condition that she used the words, "robber" and "robbery"  and against this background must their descriptive precision be weighed. How different is this, for instance, from the circumstances surrounding the statement of the decedent in an early leading case, Donnelly v. State, 26 N.J.L. 463 (Sup. Ct. 1857), aff'd 26 N.J.L. 601 (E. & A. 1857), where the declarant was carefully cautioned not to accuse anyone wrongfully, 26 N.J.L. at 501, thus bringing home to him the gravity of the charge. Certainly such was not here the case. It is hard to believe that Mrs. LePree, crying for help and rightly fearful of impending death, had any realization that her remarks would have the fateful impact upon the lives of the defendants that has in fact ensued.
Finally, we note how implausible are the inferences that must be accepted if full credence is to be given the dying *204 declaration. We must assume that these defendants undertook in broad daylight to rob a house where there was no expectation of discovering anything worthwhile; where, for all they knew  as the evidence establishes  there might just as probably have been four persons on the premises as one. We must also bear in mind that Hegel had been dating Alice for about seven months and that a relationship of an affectionate nature existed between them. Indeed, falsehoods in the statement she first gave the police were clearly motivated by a desire to protect him, and there is evidence that he reciprocated this regard. Is it likely that he would have burglarized her house? We think not. Consider, too, the manner in which Amico left the house and proceeded in a calm and unhurried manner to depart down the driveway. And had he wished to rob could he not have overcome the aged and ailing woman, whose presence on the premises was not unexpected but in fact anticipated?
Perhaps no one of the arguments set forth above would in and of itself have been sufficient to require that the statement be excluded, but when considered together they convince us that its reception amounted to prejudicial error.
In view of our conclusion upon this point we deem it unnecessary to consider any of the other alleged grounds for reversal.
The conviction is reversed and the cause remanded for further proceedings not inconsistent with the foregoing opinion.