STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOHN LEWIS GRAHAM, DEFENDANT-RESPONDENT.

Argued September 27 and 28, 1971—Decided November 8, 1971.

*Mr. David Linett,* Assistant Prosecutor, argued the cause for appellant (*Mr. Michael R. Imbriani,* Somerset County Prosecutor, attorney).

*Mr. Stephen Apollo,* Assistant Deputy Public Defender, argued the cause for respondent (*Mr. Stanley C. Van Ness,* Public Defender, attorney).

The opinion of the Court was delivered by

JACOBS, J. The Appellate Division granted leave to the State to appeal from several pretrial rulings by the trial court. Thereafter it reversed, vacating the rulings and remanding the matter for trial. *State v. Graham,* 114 *N. J. Super.* 518 (1971). We granted cross-applications by the parties for leave to appeal from the Appellate Division's action.

On August 28, 1970 the defendant allegedly shot his roommate Herman Young. The victim was taken to the

Middlesex General Hospital where he died on September 1, 1970. The defendant was indicted for murder and on January 15, 1971 an order was entered to summon a special panel of petit jurors to serve at the trial originally scheduled for February 16, 1971. Because a considerable number of the prospective jurors were excused from service, the trial judge decided that there were not enough jurors available to begin the trial and he postponed it without date. On February 22, 1971 a new order was entered for another special panel of petit jurors for the trial then scheduled to be held on March 8, 1971.

After the trial had been adjourned, the trial judge, with the consent of counsel, heard pretrial motions to determine (1) whether a tape-recorded statement given by the defendant to members of the County Prosecutor's staff would be admissible in evidence at trial as his voluntary statement and (2) whether certain statements made by the victim to the police at the Middlesex General Hospital would be admissible in evidence at trial as dying declarations within Evidence Rule 63(5) or as spontaneous and contemporaneous statements within Evidence Rule 63(4). After taking testimony, the trial judge ruled that neither the defendant's statement nor the statements by the victim would be admissible at trial. On appeal, the Appellate Division declined to pass on the soundness of the trial judge's rulings. It held that the trial judge should not have made the pretrial rulings since the Court Rules "do not authorize motions before trial to test the validity of confessions, or the admissibility into evidence of statements made by defendants or other witnesses." Its holding was clearly correct under the controlling precedents in this Court. See *State v. Hawthorne*, 49 *N. J.* 130, 142–143 (1967); *State v. Green*, 49 *N. J.* 244, 246–247 (1967); *State v. Travis*, 49 *N. J.* 428, 431 (1967); *State v. Yough*, 49 *N. J.* 587, 590–591 (1967).

*State v. Hawthorne, supra,* held that it was improper for the trial court to entertain a pretrial application to de-

termine whether a defendant's prior conviction of crime would be admissible to attack his credibility if he testified at trial. Justice Francis pointed out that such an application did not come within *R. R.* 3:5–5(b)(1) (see *R.* 3:10–1), *R. R.* 3:2A–6(a) (see *R.* 3:5–7)), or any other Court Rule. He stressed that "great caution should be exercised to avoid fractionalizing trials and risking interlocutory appeals" and that "most evidence problems are best and most expeditiously settled in the atmosphere and context of the trial." 49 *N. J.* at 143. His comments have special bearing on the trial court's rulings with respect to the alleged dying declarations and spontaneous utterances of the victim. Whether they are admissible should clearly be dealt with not before but at trial, in context and in the full light of all of the relevant surrounding circumstances established by the evidence introduced at trial.

In determining the admissibility at trial of evidence proffered as dying declarations or spontaneous utterances, the trial judge is of course governed by Evidence Rules 63(5) and 63(4) and the interpretative precedents. Thus, as provided in Rule 63(5), the deceased victim's dying declaration is admissible "if it was made voluntarily and in good faith and while the declarant was conscious of his impending death." See *State v. Hegel,* 113 *N. J. Super.* 193 (*App. Div.*), *cerlif. denied,* 58 *N. J.* 596 (1971). We find no warrant for adopting the State's suggestion that the traditional requirement with respect to the victim's consciousness of impending death now be abandoned. See *State v. Stephan,* 118 *N. J. L.* 592, 598–600 (*E. & A.* 1937); *State v. Hegel, supra,* 113 *N. J. Super.* at 198–199; *cf. Report of the New Jersey Supreme Court Committee on Evidence p.* 154 (1963); *Report of the Committee on the Revision of the Law of Evidence p.* 131–32 (1955).

So far as the proffered spontaneous statements of the victim are concerned, we agree with the State's position that Rule 63(4) does not support the trial court's notion that declarations in response to interrogation are inadmis-

sible though they otherwise satisfy the Rule. In *State v. Simmons,* 52 *N. J.* 538 (1968), *cert. denied,* 395 *U. S.* 924, 89 S. Ct. 1779, 23 L. Ed. 2d 241 (1969), we noted that the "lapse of some period of time" or the fact that the declaration was "in response to inquiry" did not preclude a *res gestae* approach or render the spontaneous declaration doctrine inapplicable where the victim "was still in a state of excitement and the psychological guarantee of trustworthiness was still present." 52 *N. J.* at 542. See *State v. Tapia,* 113 *N. J. Super.* 322, 332 (*App. Div.* 1971). In *Cestero, et al. v. Ferrara,* 57 *N. J.* 497 (1971), the injured party, immediately upon regaining consciousness, made a statement in response to an inquiry. The statement was held admissible within broadened modern-day *res gestae* principles, codified in Rule 63(4) and grounded on familiar views as to trustworthiness expressed in the following excerpt from *Wigmore*:

[U]nder certain external circumstances of physical shock, a stress of nervous excitement may be produced which stills the reflective faculties and removes their control, so that the utterance which then occurs is a spontaneous and sincere response to the actual sensations and perceptions already produced by the external shock. Since this utterance is made under the immediate and uncontrolled domination of the senses, and during the brief period when considerations of self-interest could not have been brought fully to bear by reasoned reflection, the utterance may be taken as particularly trustworthy (or, at least, as lacking the usual grounds of untrustworthiness), and thus as expressing the real tenor of the speaker's belief as to the facts just observed by him; and may therefore be received as testimony to those facts. 6 *Wigmore, Evidence* § 1747, p. 135 (3d ed. 1940). 57 *N. J.* at 502–503.

It is urged that even though most evidential rulings must properly await the course of the trial, statements in the nature of confessions present special problems, such as those arising under *Miranda v. Arizona,* 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed. 2d* 694 (1966), and should be dealt with before trial. Indeed in *State v. Green,* 49 *N. J.* 244 (1967), the defendant contended that he had a constitutional right to

have the admissibility of his confession determined in advance of trial. We found no such constitutional right but recognized that arguments pro and con could readily be mustered on the question of whether it would not be better practice to have a pretrial determination on the issue of the confession's admissibility. We concluded that the subject should be dealt with at a judicial conference which we scheduled for May 11 and 12, 1967.

In *State v. Travis*, 49 *N. J.* 428 (1967), we noted that pending the outcome of the aforementioned conference and the promulgation of pertinent rules bearing on pretrial hearings on the admissibility of confessions "no such pretrial hearing shall be held." 49 *N. J.* at 431. In *State v. Yough, supra*, 49 *N. J.* 587, the defendant moved before trial for an order excluding his confession on the ground that it was obtained in violation of *Miranda, supra*, 384 *U. S.* 436, 86 S. Ct. 1602, 16 *L. Ed. 2d* 694. The trial judge entertained the motion but when the matter came before us we expressed our disapproval. In the course of our opinion we pointed out that "under our long-standing practice, the determination as to the admissibility of a confession is properly made at rather than prior to trial"; that proposed alterations of the practice were the subject of discussion at the May 1967 Judicial Conference and were receiving study; and that pending the promulgation of formal rules, "pretrial exclusory motions addressed to confessions" should not be entertained. 49 *N. J.* at 590.

No pertinent formal rules have been promulgated to date and accordingly the authorized practice still is to hear such applications at rather than before trial. We understand that trial judges, in the exercise of their discretion, have occasionally heard such applications on the trial date but before actual selection of the jury and that after making their determinations they have immediately proceeded with the trial without any fragmentation or interruption. On a broad view, that course may be justified as representing a determina-

tion at rather than before trial within the contemplation of *Green, Travis and Yough;* in any event, we do not now disapprove it since it does serve to avoid the waste and inconvenience of having the members of a jury confined while the trial judge, in their absence, conducts a preliminary *Miranda* hearing or the like.

In *Yough, supra,* 49 *N. J.* 587, the parties had agreed to a pretrial determination of the *Miranda* issue; we there passed the procedural irregularity, considered the merits, and held that the trial judge had erred in his finding that the confession was inadmissible under *Miranda.* Similarly here we may pass the procedural irregularity and consider the admissibility of the defendant's statement. The statement was given to the captain of detectives attached to the Somerset Prosecutor's office in the presence of an assistant prosecutor and a municipal officer. It was tape-recorded on a recorder furnished by the assistant prosecutor and with the defendant's full awareness that his remarks were being so recorded. The tape was played before the trial judge and an accurate transcription of what appears on the tape is set forth in the record before us. At the very beginning the detective introduced himself and the others present and then advised the defendant that he wanted to give him his "complete constitutional rights." He told the defendant that he had "an absolute right to remain silent," and "a right to counsel" of his own choosing; that if he could not afford one the court would assign one to him "without any cost"; that anything he said must be voluntary and "may be used against" him in the event of criminal prosecution; and that his "statement must be voluntary without the use of any force, fear, threats, promise of reward or leniency." After giving the warnings the detective asked the defendant whether he understood and the defendant replied "Yes, I do."

The detective then asked the defendant whether he had an attorney; the defendant stated that he had called Mr. Klitz-

man who advised that he would send someone down that day or the next and that the defendant should not say anything until "they saw" him. The defendant then said "So maybe it would be best if I waited 'till I get an attorney present really to tell you the truth because it's a very serious offense. It is — it was an accident, like I said. It was 100 per cent accident." The following then occurred:

Q. Then I understand you don't want to discuss this ah circumstances or the incident at all unless you speak with your attorney?

A. Yes, because of the simple fact that ah I don't want my words to be twisted. You know what I mean ah—

Q. I don't want to twist your words either, John. As you know, we have a tape recorder here though that I can't put words in your mouth—

A. Yes, I but—I understand—

Q. —and I want to be fair with you in every aspect of the case. Now, if you decide that you don't want to discuss it further, that will be the end of this interview. That's entirely up to you.

A. You know, like I said—

Q. I'm not trying to force you or to trick you into doing anything that you don't want to say. That's entirely up to you. You want to rely on your attorney, that's positively all right with me.

A. Well—

Q. And we'll terminate this if you want.

A. Ah—one fact—

Q. Do you want to say anything?

A. I'm saying something now. One fact somebody had to ah break into our quarters. Ah—they showed me where they had ripped out this here, so forth, where they had—

The defendant continued with his volunteered remarks, stressing that the shooting was an accident. When he had finished wtih his version as to what had happened the detective said to the defendant: "You wanted to tell me this? I didn't ask you to discuss it?" The defendant's answer was as follows: "You didn't. You know something, it's been on my mind, I don't know. I've been wanting to — it's no lie. It's no lie. It was an accident I swear to God it was an accident." At that point the detective inquired whether he could ask a few questions and the defendant replied "Yes, you may." Towards the end of the statement the detective

asked the defendant whether he had been intimidated or forced to say anything he did not want to say, to which the defendant replied "You have made me get it off my chest mister. That's what you have made me do. Thank you."

The trial judge did not question the credibility of the detective's testimony nor did he question the accuracy of the tape recording. He did, however, consider the warnings insufficient under *Miranda* since they did not embody explicit language advising that the defendant had the right to have counsel present during questioning. But the record before us leaves little room for doubt that the warnings were intended to convey that advice, that they fairly did so, and that the defendant so understood them. *Cf. State v. Yough, supra,* 49 *N. J.* at 594–595. The trial judge also considered that after the defendant had told the detective that he had talked to his lawyer he was improperly "coaxed" to answer in violation of *Miranda.* We read the record differently. The defendant was neither unintelligent nor unaware and he was not dealt with unfairly. As already indicated the defendant knew that his remarks were being tape-recorded. When he told the detective that he had an attorney, the detective properly replied "then I understand you don't want to discuss this" unless you speak with your attorney. After comments about the twisting of words, the detective said flatly and clearly: "Now if you decide that you don't want to discuss it further that will be the end of the interview. That's entirely up to you." He followed this up with the equally clear remark that if the defendant wanted to rely on his attorney that was "positively all right" and that "we'll terminate this if you want." At that point the defendant did not want to terminate the interview but, in his own interests as he saw them, he wanted to tell the detective that the shooting was an accident and he proceeded to do so. Later on the defendant expressly acknowledged to the detective that he wanted to tell him about the shooting even though he had not been asked to discuss it, and at the close he expressed his thanks because he had gotten it off his

chest. Surely all of this negates any suggestion of coercion, intimidation or any other oppressive practice aimed at by *Miranda*.

We reject the trial judge's finding that the defendant did not waive his rights to remain silent within the requirements of *Miranda*. Waiver need not take a designated legal form nor need it be expressed in designated legal terminology. *State v. Yough, supra*, 49 *N. J.* at 596. As *State v. Kremens*, 52 *N. J.* 303, 311 (1968), put it: "Any clear manifestation of a desire to waive is sufficient." The fact that the defendant had retained or called for an attorney did not preclude him from thereafter affirmatively volunteering information thereby waiving his rights to remain silent and to have counsel present. *State v. McKnight*, 52 *N. J.* 35 (1968); *cf. State v. Magee*, 52 *N. J.* 352 (1968), *cert. denied*, 393 *U. S.* 1097, 89 *S. Ct.* 891, 21 *L. Ed. 2d* 789 (1969).

In *McKnight*, the defendant was given the *Miranda* warnings and said he wanted a lawyer before he answered any questions. On the following morning the defendant sent a note saying that he wanted to see the prosecutor so that he could answer his inquiry. He was taken to the prosecutor and after the *Miranda* warnings were repeated he made a complete oral confession. We held the confession admissible, rejecting the contention that *Miranda* was to be applied inflexibly so as to exclude automatically any statement made by the defendant in the absence of counsel after he once asked the counsel.

In the course of his opinion for the Court in *McKnight*, the Chief Justice noted that *Miranda* was fashioned "solely to counteract the coercion of custodial interrogation" (52 *N. J.* at 54) and was not designed to preclude the defendant from freely expressing himself, in inculpatory manner or otherwise, after he was fully advised as to his constitutional rights. By so expressing himself the defendant "waived" his rights to remain silent and to have counsel present; clearly his earlier request for counsel did not *per se* disable

him from thus later deliberately "waiving counsel." 52 *N. J.* at 44.

Miranda did say that evidence that "the accused was threatened, tricked or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." 384 *U. S.* at 476, 86 *S. Ct.* at 1629, 16 *L. Ed. 2d* at 725. But here we find nothing suggesting compulsion or deception of the type contemplated by the Court's language in *Miranda*. After the defendant mentioned his lawyer and the detective expressed his understanding that the defendant did not then wish to talk, the defendant did not stop but volunteered the remark that he did not want his words twisted. In view of that remark, the detective understandably noted that the tape recorder would preclude putting any words in the defendant's mouth. And when the detective said that the discussion would be immediately terminated if that was what the defendant wanted, the defendant clearly indicated that he did not want to terminate but, on the contrary, he volunteered "one fact" which he proceeded to expand upon. It is indeed difficult to find anything in what transpired which was violative of the terms or purposes of the constitutional prohibition against *compelling* a defendant in a criminal case to be a witness against himself (*McKnight, supra,* 52 *N. J.* at 52–56) or was violative of the true goals or the stated proscriptions of *Miranda, supra,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed. 2d* 694. All in all, we are satisfied that on the record as submitted to us, the defendant's statement could properly be received in evidence at trial. Since the Appellate Division's determination herein simply vacated the trial court's ruling to the contrary, along with its rulings with respect to the victim's statements, and remanded the entire matter for full trial it is hereby:

Affirmed.

*For affirmance*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR,, SCHETTINO and MOUNTAIN—6.

*For reversal*—None.