**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4202-17T2

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

COURTNEY SIMPSON, a/k/a
DALE SIMPSON,

    Defendant-Appellant.

_____

Argued January 23, 2020 – Decided May 6, 2020

Before Judges Koblitz, Whipple and Gooden Brown.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 15-02-0113.

Paul Condon argued the cause for appellant.

Marc A. Festa, Assistant Prosecutor, argued the cause for respondent (Camelia M. Valdes, Passaic County Prosecutor, attorney; Christopher W. Hsieh, Chief Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Following a jury trial, defendant was convicted of first-degree aggravated manslaughter, N.J.S.A. 2C:11-4(a)(1), as a lesser included offense of murder, N.J.S.A. 2C:11-3(a)(1) and 3(a)(2) (count one); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two); and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count three). The convictions stemmed from defendant fatally shooting a guest at a house party during an altercation involving several party attendees. The altercation began in the house and continued in a supermarket parking lot across the street, where the shooting was captured on surveillance cameras. Defendant was apprehended in Florida almost a year later. After denying defendant's pro se motion for a judgment of acquittal notwithstanding the verdict and a new trial, see R. 3:18-2 and R. 3:20-2, the judge sentenced defendant to an aggregate twenty-two-year term of imprisonment, subject to an eighty-five percent period of parole ineligibility pursuant to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

On appeal, defendant raises the following points for our consideration:

A-4202-17T2

POINT I

THE COURT'S FAILURE TO CONDUCT A WADE/HENDERSON[1] HEARING ON THE ADMISSIBILITY OF A CHALLENGED IDENTIFICATION DEPRIVED [DEFENDANT] OF A FAIR TRIAL.

POINT II

THE STATE'S NARRATION OF THE SURVEILLANCE VIDEO DEPRIVED DEFENDANT OF A FAIR TRIAL.

POINT III

THE ADMISSION OF THE "DYING DECLARATION" DEPRIVED DEFENDANT OF A FAIR TRIAL (NOT RAISED BELOW).

POINT IV

THE STATE'S CLOSING ARGUMENT IMPROPERLY SUGGESTED DEFENDANT FLED AND IMPROPERLY ALLUDED TO WITNESS INTIMIDATION THEREBY DEPRIVING DEFENDANT OF A FAIR TRIAL.

POINT V

THE SENTENCE OF THE COURT WAS EXCESSIVE (NOT RAISED BELOW).

Having considered the arguments and applicable law, we affirm.

---

[1] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

A-4202-17T2

I.

We glean these facts from the trial record. On February 22, 2014, at approximately 2:00 a.m., Ferron Green was fatally shot several times in the parking lot of Universal Supermarket, located on Ellison Street in Paterson. Earlier that evening, Green and about thirty individuals attended a house party directly across the street from the supermarket. At some point during the party, the host, known as Yardy, turned the music off and ordered the guests to leave. Green and another guest, identified as Shane, argued with Yardy to turn the music back on and keep the party going. Eventually, Green and Shane started arguing with each other. As the argument escalated, Green, Shane, Yardy, and several other party attendees, including defendant, walked across the street to the supermarket parking lot where they faced off in a circle. Green and Shane continued arguing and screamed "obscene" epithets at one another.

As the argument became increasingly combative, some guests tried unsuccessfully "to break it up." At some point, someone yelled a particularly offensive epithet, followed by the firing of successive gunshots, prompting everyone to quickly disperse. Moments after the gunshots were fired, several party guests found Green lying on the ground of the parking lot, pleading for

4

them to call an ambulance and declaring that he was going to die.  When police officers responded to the scene and asked Green who shot him, Green responded, "I'm going to die."  Green was transported by ambulance to the hospital, where he later succumbed to his injuries.  A State medical examiner subsequently ruled Green's "cause of death" as "multiple gunshot wounds" to the "torso and right leg," and "manner of death" as "homicide."

During the ensuing investigation, police recovered surveillance footage that "capture[d] the shooting" from "video cameras" located "on the outside of . . . the supermarket."  Additionally, witnesses provided recorded statements to police, as a result of which defendant was identified as the shooter and a warrant was issued for his arrest.  Notably, Detective Rafael Fermin of the Paterson Police Department interviewed Shellina Morgan, who informed him that although "[s]he did not see the shooting," she saw a person she knew as "Dolla" "with a gun inside the party."  When Fermin showed Morgan a photograph of defendant, Morgan identified defendant as Dolla, but refused to sign the photograph because "[s]he was scared."[2]  Thereafter, officers were unable to

---

[2]  At trial, pursuant to State v. Gross, 121 N.J. 1, 15-17 (1990), Morgan's statements to Fermin were admitted as substantive evidence following an N.J.R.E. 104 hearing outside the presence of the jury conducted after Morgan feigned lack of recollection while testifying.  See State v. Brown, 138 N.J. 481,

find defendant in New Jersey. Almost a year later, in December 2014, defendant was located in Fort Lauderdale, Florida, and transported back to New Jersey to face the homicide related charges lodged against him.

During the six-day trial, along with responding police officers, detectives, and the State medical examiner, several witnesses who had attended the party and were present during the altercation in the parking lot testified for the State. The surveillance footage from the supermarket was also played for the jury.

Williard Buchanan attended the party and testified that when the altercation began in the house, Green and defendant were arguing, and he observed defendant holding an object behind his back that "looked like a gun." Buchanan stated that he was still in the house when he heard gunshots. He testified that when he ran outside after the shooting and tended to Green, Green handed him his car keys and told him repeatedly that "he [was] going to die." Buchanan said Green was "mumbling something about who shot him" but he "[c]ouldn't hear clearly." When pressed, Buchanan confirmed that he had previously told police "[i]t sound[ed] like [Green] said" "Dolla sh[]ot [him]," but claimed he was pressured to cooperate because "[he] was on probation" and

---

542 (1994), overruled in part on other grounds by State v. Cooper, 151 N.J. 326, 377 (1997) ("[A] feigned lack of recollection is an inconsistency on which the admission of a witness's prior inconsistent statement may be based.").

"[he] was subject to deportation." On cross-examination, Buchanan admitted that he "just said whatever to save [his] a-s-s." Buchanan identified defendant in court as "Dolla."

Keston Miguel participated in the face-off in the parking lot and testified that after the shooting, he observed Green fall to the ground and a gun in defendant's[3] hand. However, on cross-examination, he admitted that he was coerced by police to incriminate defendant and, in fact, never saw defendant with a gun. According to Miguel, after the shooting, he immediately jumped into "[a] van" driven by Mario Tyrell and occupied by three other party attendees, including defendant.

Tyrell confirmed that Miguel and three other men, including defendant, "jumped in" his van immediately after the shooting. According to Tyrell, he had been in the parking lot during the face-off, ran towards his parked van after the shooting, and saw defendant's hand pointing in Green's direction when he looked back. Although no one spoke explicitly of the shooting during the ride, defendant stated that he had never liked Green, and, as defendant sat in the van, Tyrell "glimpsed a gun" "tucked" in defendant's waistband.

---

[3] During a police interview, Miguel identified defendant's photograph as Dolla, and identified defendant at trial as Dolla.

A-4202-17T2

Shawanda Evans, Morgan's cousin, testified that after the "commotion," she found Green lying in the parking lot bleeding. She testified that when she tried to put pressure on his bullet wounds, Green told her "I'm dead, I'm dead, I'm dead." Shantress Smith attended the party with Evans. Smith testified she heard gunshots and ran to the parking lot, where Green asked her to "call the ambulance" and told her "I feel like I'm dying. I'm dying. I'm dying." Defendant did not testify or present any witnesses at trial.

## II.

In Point I, defendant asserts that he was deprived of a fair trial because the trial judge failed to conduct "a Wade/Henderson hearing outside the presence of the jury" before admitting Morgan's "videotaped statement" to police, in which she implicated defendant as the shooter. Defendant acknowledges that while the judge conducted a Gross hearing to consider the admissibility of Morgan's prior recorded statements when she feigned lack of recollection while testifying, the judge denied him a Wade/Henderson hearing because Morgan "was familiar with the defendant."

To be entitled to a Wade/Henderson hearing, a defendant must first proffer "some evidence of suggestiveness" that could result in a misidentification. Henderson, 208 N.J. at 238, 288. No such evidence was presented here. Morgan

8

identified "Dolla," with whom she was familiar, as the person she observed with a gun at the party. Morgan supplied defendant's nickname, and Detective Fermin showed her a photograph of that person for confirmation. A Wade/Henderson hearing is not warranted in these circumstances where the witness identifies the suspect by a nickname, and the officer's act of showing the witness a photo of the person associated with that nickname was simply a confirmatory identification. "A confirmatory identification occurs when a witness identifies someone he or she knows from before but cannot identify by name," or can "only [identify] by a street name." State v. Pressley, 232 N.J. 587, 592-93 (2018). Indeed, "a 'confirmatory' identification [as occurred here] . . . is not considered suggestive." Id. at 592.

In Point II, defendant argues that Detective Fermin's narration of the "surveillance videotape of the criminal incident" obtained from the supermarket "required no specialized skill," provided the "State's version of the incident" to the jury, and thereby "deprived him of a fair trial." Thus, defendant infers that the judge erred in permitting the narration.

While the surveillance video from the supermarket was played for the jury, Fermin provided the following narration:

You can see from this area right here, it's a group of males gathering.  It looks like they're having a conversation.

. . . .

Keep your eyes on this area right here, a lot of the males will fall down shortly.  There he is on the ground.  And this group of males will head this way and eventually get in a car or mini van.

. . . .

And there goes the mini van.  As you can see there's movement around it and it's about to take off and makes a left down East 18th.  We later learn through our investigation that [the] mini van goes onto Madison Ave. and crosses over Park Ave.

. . . .

. . . . [I]n the area there is what we believe is a muzzle flash in this area right before the victim falls.

. . . .

The area where the group of males are and the male then falls.  So there is a muzzle flash that we see.  But again you won't be able to see it.  It's hard to see on this screen because it's expanded and it distorts the picture.

During the narration, defense counsel only objected when Fermin said that the "group of males will head this way and eventually get in a car or mini van." According to defense counsel, Fermin was "testifying to something [] not in the

video yet." The judge overruled the objection, noting that Fermin was simply "describing what [the video] depicts."

We review a trial court's evidentiary determinations under an abuse-of-discretion standard. State v. Perry, 225 N.J. 222, 233 (2016). An abuse of discretion occurs when a trial court's evidentiary ruling "was so wide of the mark" as to result in "a manifest denial of justice" and the evidence diverts the jurors from a reasonable and fair evaluation of guilt or innocence. State v. Marrero, 148 N.J. 469, 484 (1997) (quoting State v. Kelly, 97 N.J. 178, 216 (1984)); State v. Moore, 122 N.J. 420, 467 (1991). "However, '[w]hen the trial court fails to apply the proper test in analyzing the admissibility of proffered evidence,' our review is de novo." Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012) (alteration in original) (quoting Pressler & Verniero, Current N.J. Court Rules, cmt. 4.6 on R. 2:10-2 (2012)).

A law enforcement officer's narrative testimony of surveillance footage depicting the crime is considered lay opinion testimony.

> Lay witnesses may present relevant opinion testimony in accordance with Rule 701, which permits "testimony in the form of opinions or inferences . . . if it . . . is rationally based" on the witness'[s] "perception" and "will assist in understanding the witness'[s] testimony or in determining a fact in issue."

"The Rule does not permit a witness to offer a lay opinion on a matter 'not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion.'" State v. McLean, 205 N.J. 438, 459 (2011) (first, second, and fourth alterations in original) (quoting Brindley v. Firemen's Ins. Co., 35 N.J. Super. 1, 8 (App. Div. 1955)). As the McLean Court stated, lay opinion "is not a vehicle for offering the view of the witness about a series of facts the jury can evaluate for itself." Id. at 462. "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

Here, we are satisfied that Fermin's narration of the surveillance footage exceeded the bounds of permissible lay opinion testimony. Because he based his testimony on his observations of the video, and not on any personal knowledge, he was in no better position than the jury to draw conclusions about what the video showed. However, we conclude that permitting the narration constitutes harmless error.

"An evidentiary error will . . . be found 'harmless' if there is [no] reasonable doubt as to whether the error contributed to the verdict." State v. J.R., 227 N.J. 393, 417 (2017). Said another way, "[t]he harmless error standard

12

requires that there be some degree of possibility that [the error] led to an unjust result. The possibility must be real, one sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached." Lazo, 209 N.J. at 26 (citation and internal quotation marks omitted). See R. 2:10-2 ("Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result").

Here, Fermin's narration provided no more information than what the video showed. The jury was able to assess his statements as well as make its own independent assessment of the video irrespective of Fermin's narration. This is not a case where a police witness impermissibly identified a defendant depicted in a surveillance photo or video with no personal knowledge of the crime and no prior familiarity with the defendant. See Lazo, 209 N.J. at 24 (clarifying that a law enforcement officer may not offer a lay opinion on identification from a surveillance photo where the officer did not witness the crime, did not know the defendant, and the officer's opinion stemmed entirely from the victim's description). Thus, we are satisfied the error was not capable of producing an unjust result and did not deprive defendant of a fair trial.

We also conclude that it was harmless error for Fermin to indicate that he "later learn[ed] through . . . investigation" the minivan's course of travel. While the testimony constituted hearsay, it neither implicated defendant in the crime nor was clearly capable of producing an unjust result. See State v. Branch, 182 N.J. 338, 349-51 (2005) (barring hearsay testimony which leads the jury to infer that a police officer received information from an unknown source implicating the defendant in a crime).

In Point III, defendant argues the judge "should have conducted a[n] [N.J.R.E. 104] hearing . . . to determine the exact content of . . . Buchanan's testimony regarding the dying declaration even though the defense waived said right." Defendant continues that the judge also failed "to consider the prejudice to defendant by the admission of the purported dying declaration" and "the repeated recitation of the victim's 'dying declaration' deprived him of a fair trial."

Defendant waived an N.J.R.E. 104 hearing on the admissibility of Buchanan's testimony as a dying declaration "for very good tactical reasons." Thus, reviewing this claim under the doctrine of invited error, we find no fault with the judge's decision to evaluate the admissibility of Buchanan's testimony without conducting an N.J.R.E. 104 hearing. See N.J. Div. of Youth & Family

14

Servs. v. M.C. III, 201 N.J. 328, 340-42 (2010) (holding that where defense counsel makes strategic decision at trial, a reviewing court will not reverse in the absence of fundamental injustice).

Citing State v. Graham, 59 N.J. 366, 370 (1971), the judge admitted the testimony under N.J.R.E. 804(b)(2), explaining that

> the victim's out-of-court statement . . . has to be made while the victim believed his death was imminent. The [c]ourt in making [the] decision as to admissibility looks to the nature of the injury and the extent of the wound.
>
> Here, . . . there were bullet wounds to the torso and leg of the [victim]. He was bleeding profusely. . . . [F]rom the testimony . . . from various witnesses, . . . Green[] was aware of the nature and extent of his wounds.
>
> He was aware of the imminence of death having said, even according to the testimony of these other witnesses, I'm dead, I'm dead. . . . [W]itnesses . . . tried to reassure [Green] that he was not dying, but it's clear that [Green] believed that he was. He was prostrate. He was in a very perilous situation.
>
> . . . .
>
> [T]he condition of the declarant was grave and his own expressions of his sense of . . . imminent death could not have been clearer. This is . . . virtually a textbook example of what a dying declaration is.

15

> Someone who knows that they're dying spontaneously makes a statement as to the person who purportedly shot him. . . .
>
> . . . . [A]ll the witnesses corroborate one another in terms of what the [victim's] state of mind was when he was speaking. There is, of course, one glaring difference between what the other witnesses said and what . . . Buchanan is expected to testify to, namely the fact that none of the other witnesses have said that . . . Green identified the shooter. And that, of course, is the whole subject of what his anticipated testimony is about to be.

N.J.R.E. 804(b)(2) provides that "in a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of [his] impending death." See also Graham, 59 N.J. at 371. "A commonly expressed justification for including dying declarations among the exceptions to the hearsay rule is that the realization of impending death supports a strong likelihood of credibility." State v. Hegel, 113 N.J. Super. 193, 203 (App. Div. 1971). In evaluating the admissibility of the out-of-court statement, "all the attendant circumstances should be considered, including the weapon which wounded [the declarant], the nature and extent of his injuries, his physical condition, his conduct, and what was said to and by him." Id. at 201 (quoting Commonwealth v. Knable, 85 A.2d 114, 117 (Pa. 1952)).

16

> Whether the attendant facts and circumstances of the case warrant the admission of a statement as a dying declaration is in the first instance for the court, but, when admitted, the declarant's state of mind and the credibility, interpretation and weight to be given his statement are for the jury under proper instructions.
>
> [Ibid. (quoting Knable, 85 A. 2d at 117).]

"Where [the out-of-court statement] takes the form of an opinion or a conclusion it should not be offered to the jury until a preliminary determination has been made by the judge that in light of the totality of all relevant circumstances it can fairly be received without undue prejudice." Id. at 202. Thus, "the trial court must weigh, under N.J.R.E. 403, probative value of the dying declaration against the prejudice to defendants of its admission." State v. Brown, 236 N.J. 497, 523 (2019). "N.J.R.E. 403 instructs that 'relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice.'" Ibid. (alteration in original) (quoting N.J.R.E. 403).

Here, there was sufficient credible evidence in the record to support the judge's determination that Green's statement to Buchanan was admissible as a dying declaration under N.J.R.E. 804(b)(2). Green made the statement voluntarily, without prodding or interrogation, while aware of his impending death based on the nature and extent of his injuries. The fact that Green reiterated that he was dying to multiple witnesses simply reinforced his belief in

17

the imminence of his impending death.  Thus, under all the attendant circumstances, we conclude the judge did not abuse his discretion in admitting Green's statement to Buchanan as a dying declaration.  See State v. Buda, 195 N.J. 278, 294 (2008) ("Trial court evidentiary determinations are subject to limited appellate scrutiny, as they are reviewed under the abuse of discretion standard.").

Unquestionably, Green's dying declaration had substantial probative value.  As the judge pointed out, Buchanan's expected testimony differed markedly from the others because Green identified the shooter to Buchanan. That said, the statement was also prejudicial to the defense.  "Indeed, evidentially, admission of 'a dying declaration is often terrible in its consequence and well nigh impossible to counter.  It has been described as "devastating" in its impact.'"  Ibid. (quoting Hegel, 113 N.J. Super. at 202). However, in the circumstances of this case, any undue prejudice was mitigated by defense counsel's effective cross-examination of Buchanan, who ultimately admitted that he was pressured to incriminate defendant because "[he] was on probation" and "subject to deportation."

In Point IV, defendant argues he was deprived "of his right to a fair trial" by the State's comments during summation.  Specifically, defendant asserts "the

State improperly argued defendant's absence from the jurisdiction amounted to a consciousness of guilt[] despite the trial court specifically declining to instruct the jury on that principle." Further, according to defendant, the State "improperly alluded to witness intimidation by asking the jury to step into the shoes of its witnesses in testifying against defendant."

In assessing whether a prosecutor's remarks in summation require reversal, we evaluate whether the conduct "was so egregious that it deprived the defendant of a fair trial." State v. Frost, 158 N.J. 76, 83 (1999). "Prosecutors may not make inaccurate factual or legal assertions during summation, and they must confine their remarks to evidence revealed during trial, and reasonable inferences to be drawn from the evidence." State v. Rodriguez, 365 N.J. Super. 38, 48 (App. Div. 2003) (citing State v. Smith, 167 N.J. 158, 178 (2001)). However, "[p]rosecutors are permitted to respond to arguments raised by defense counsel as long as they do not stray beyond the evidence." State v. Morais, 359 N.J. Super. 123, 131 (App. Div. 2003).

"Whether particular prosecutorial efforts can be tolerated as vigorous advocacy or must be condemned as misconduct is often a difficult determination to make. In every instance, the performance must be evaluated in the context of the entire trial, the issues presented, and the general approaches employed."

State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002). "To justify reversal, the prosecutor's conduct must have been 'clearly and unmistakably improper,' and must have substantially prejudiced defendant's fundamental right to have a jury fairly evaluate the merits of his defense." State v. Timmendequas, 161 N.J. 515, 575 (1999).

In making this determination, factors to be considered include whether defense counsel made a timely objection, whether the remark was withdrawn promptly, whether the trial judge ordered the remarks stricken, and whether the judge instructed the jury to disregard them. State v. Ramseur, 106 N.J. 123, 322-23 (1987). See also State v. Smith, 212 N.J. 365, 403 (2012). "If no objection is made, the remarks usually will not be deemed prejudicial." Ramseur, 106 N.J. at 323. See also State v. R.B., 183 N.J. 308, 333 (2005) ("Generally, if no objection was made to the improper remarks, the remarks will not be deemed prejudicial." (quoting Frost, 158 N.J. at 83)).

Here, during summation, the State made the following comments regarding defendant's whereabouts after the shooting:

> [B]ased upon all this information that the officers were provided they identified the killer, [defendant]. They start to look for him. They didn't find him in Paterson, and they didn't find him in Passaic County. They didn't even find him in New Jersey. They found him in Fort Lauderdale, Florida. Did you hear any testimony about

anyone else being found outside of the State of New Jersey? Only [defendant]. Why? Why was he in Fort Lauderdale, Florida after someone was just murdered? Because he murdered him. Because he took his life for nothing. Because he wanted to avoid this. He wanted to avoid . . . . [Green's] day for justice.

Defendant did not object to the prosecutor's remarks during summation. After the judge delivered the final jury instructions and inquired whether there were any exceptions to the charge, defense counsel responded in the negative and noted there was no "need [for] a charge on flight because [the prosecutor] argued it in his summation." We reject defendant's contention that defense counsel's comment constituted an objection to the prosecutor's remarks, permitting us to presume that the remarks were not deemed prejudicial at the time they were made, and requiring reversal only upon a finding of plain error. To find plain error, the error must be "clearly capable of producing an unjust result." R. 2:10-2. "The error must have been of sufficient magnitude to raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." State v. Weston, 222 N.J. 277, 294 (2015) (quoting Pressler & Verniero, cmt. 2.1 on R. 2:10-2 (citations omitted)). Defendant bears the burden of proving plain error. Id. at 295.

"Departure from the scene after a crime has been committed, of itself, does not warrant an inference of guilt." State v. Sullivan, 43 N.J. 209, 238 (1964).

21

"For departure to take on the legal significance of flight, there must be circumstances present and unexplained which, in conjunction with the leaving, reasonably justify an inference that it was done with a consciousness of guilt and pursuant to an effort to avoid an accusation based on that guilt." State v. Ingram, 196 N.J. 23, 46 (2008) (quoting State v. Mann, 132 N.J. 410, 418-19 (1993)). However, such circumstances need not "'unequivocally support a reasonable inference' of the defendant's guilt." State v. Randolph, 228 N.J. 566, 595 (2017) (citation omitted).

Here, the prosecutor's remarks constituted fair comment on the evidence presented at trial. While numerous party attendees were interviewed by police following the shooting, defendant's whereabout were unknown and he was not located until almost a year later in Florida. Thus, it was entirely reasonable for the prosecutor to suggest to the jury that defendant's purpose in leaving the State was to avoid accusation or apprehension. The fact that the judge determined there was insufficient evidence to justify a flight charge does not obviate the reasonableness or the propriety of the prosecutor's remarks in the circumstances of this case. Nor does it constitute plain error, particularly in light of the judge's clear instruction to the jury that "summations of counsel are not evidence," and

22

"are not controlling," and that the jury "must rely solely upon [its] understanding and recollection of the evidence."

Defendant also challenges the following unobjected-to remarks, characterizing them as the prosecutor "improperly allud[ing] to witness intimidation[:]"

> People are murdered and witnesses don't want to talk. Why do you think that is? Why do you think these witnesses [want to] have nothing to do with this case? . . . . You need to appreciate their position. Appreciate what's being asked of them. They are being asked to come in through those doors, walk in, sit down on that witness stand and point a finger at a murderer. They're being asked to point a finger at the same person who murdered [Green] over nothing.
>
> Think back to jury selection. . . . In that first moment you learned that this was a murder trial. That you were potentially going to be a juror on a murder trial. Think about that . . . first feeling you had.
>
> Now, try to imagine how these witnesses felt to be a witness on a murder trial, dark trial. Imagine what's going through their heads. Imagine what they're feeling. And . . . then, decide what's scarier, law enforcement intimidation or the streets? At the end of the day the purpose of all of this is to seek the truth. Ask yourselves were the witnesses truthful? Did they tell the truth to the police when they first met? Did they tell the truth when they were on this witness stand? Did they tell us everything that they know?

During summation, defense counsel forcefully attacked the credibility of various party attendees who testified for the State, and poignantly pointed out that some witnesses only incriminated defendant after they were intimidated and threatened during aggressive police questioning. In particular, defense counsel stated "the only way [police] could get anything incriminating about [defendant] from . . . Miguel was to arrest him for a murder he didn't commit." Defense counsel continued that Tyrell, who had a "serious criminal history" which included "a gun conviction," testified "about the kind of pressure he was under to get him to say" he "saw [defendant] with a gun." Similarly, according to defense counsel, Buchanan "also, succumbed to his own fears about what would happen to him if he didn't tell the police what they wanted to hear." The prosecutor's challenged remarks addressed the witnesses' reluctance to testify and responded to defense counsel's attacks on their credibility.

Considered in the context of the evidence presented, defense counsel's forceful attacks, and the prosecutor's otherwise proper summation, we are convinced the comments were not "so egregious that [they] deprived defendant of a fair trial," State v. Papasavvas, 163 N.J. 565, 616 (2000), or "clearly capable of producing an unjust result." R. 2:10-2. See State v. Echols, 199 N.J. 344, 360 (2009) (finding that the prosecutor's comments "intend[ing] to show that

several witnesses were threatened and intimidated as part of the State's effort to explain the change in their anticipated testimony" was not "so egregious" as to deprive defendant of a fair trial). In sum, we find none of the prosecutor's remarks met the plain error standard of review, and the failure to object suggests that defense counsel did not believe the remarks were prejudicial at the time they were made. See R.B., 183 N.J. at 333.

Finally, in Point V, defendant challenges his sentence as "excessive," arguing the judge "failed to give meaningful credit to defendant's mitigating factors," and "erroneously cited aggravating factors three and nine because defendant failed to show remorse." We disagree.

"Appellate review of the length of a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011). We will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."
>
> [State v. Fuentes, 217 N.J. 57, 70 (2014) (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

25

At sentencing, the judge found mitigating factor seven, N.J.S.A. 2C:44-1(b)(7), based on defendant having previously led "a law abiding life," and, as "a non[-]statutory [mitigating] factor," the fact that defendant was "employed." Relying on State v. Carey, 168 N.J. 413 (2001) and State v. Rivera, 252 N.J. Super. 142 (App. Div. 1991), the judge found aggravating factor three, N.J.S.A. 2C:44-1(a)(3), based on defendant's "risk of re-offending," and aggravating factor nine, N.J.S.A. 2C:44-1(a)(9), based on the need for deterrence.

In Carey, our Supreme Court explained that the defendant's denial of responsibility for the crash in a vehicular homicide case after the jury returned a guilty verdict "does not irrefutably prove that defendant is likely to reoffend, but it does provide support for the trial court's conclusion" at sentencing "that defendant was likely to re-offend." 168 N.J. at 427. Likewise, in Rivers, after defendant was found guilty by a jury of various assault and weapons related offenses, we held that the "[d]efendant's consistent denial of involvement and his lack of remorse indicate[d] that a prison sentence [was] necessary to deter defendant from similar conduct in the future, and therefore, the trial court properly found aggravating factor[s] N.J.S.A. 2C:44-1a(9)" and "N.J.S.A. 2C:44-1a(3) . . . because there [was] a risk that defendant [would] commit another offense." 252 N.J. Super. at 153-54.

26

Here, regarding aggravating factor N.J.S.A. 2C:44-1(a)(3), the judge stated he was "disturbed by a continued lack of remorse," and "denial [of] responsibility on [defendant's] part." Regarding aggravating factor N.J.S.A. 2C:44-1(a)(9), the judge explained that "by everyone's admission," this was a "heartless act" that showed "depravity" on defendant's part. As a result, "the need for public safety" as well as "both specific and general" "deterrence" were "heightened." The judge explained that defendant's "lack of remorse" and "consistent denial of wrongdoing" established a need for "specific" deterrence. Additionally, "general" deterrence was warranted because "the message has to go out that you cannot senselessly take other people's lives."

Giving "substantial weight" to the aggravating factors and "nominal weight" to the mitigating factors, the judge determined that "the aggravating factors . . . substantially outweigh[ed] the mitigating factors" to justify a sentence "beyond the mid[-]range" on all counts. See Fuentes, 217 N.J. at 73 ("[R]eason suggests that when the mitigating factors preponderate, sentences will tend toward the lower end of the range, and when the aggravating factors preponderate, sentences will tend toward the higher end of the range." (quoting State v. Natale, 184 N.J. 458, 488 (2005))). Accordingly, the judge sentenced

27

defendant to twenty-two years, subject to NERA, on count one,[4] "merged" the weapons offenses "for purposes of sentencing," and imposed a concurrent eight-year term, with forty-two months of parole ineligibility, on count two.

Applying our deferential standard of review, we are satisfied that the judge's findings regarding aggravating and mitigating factors are amply supported by the record, that the sentence imposed was in accordance with guidelines enunciated in the Code of Criminal Justice, and that the aggregate sentence is not manifestly excessive or unduly punitive, and does not constitute an abuse of discretion or shock our judicial conscience.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] Aggravated manslaughter under N.J.S.A. 2C:11-4(a)(1) carries "an ordinary term of imprisonment between [ten] and [thirty] years." N.J.S.A. 2C:11-4(c).

28                                                          A-4202-17T2