JOHN J. POLILLO, A RESIDENT AND TAXPAYER OF THE CITY OF ATLANTIC CITY, PLAINTIFF-RESPONDENT, v. SETH GROSSMAN; JAMES W. MASLAND, III; REESE PALLEY, AND HARRY BACHEN, MEMBERS OF THE ATLANTIC CITY CHARTER STUDY COMMISSION, DEFENDANTS-APPELLANTS, AND ADELAIDE DEANE, CLERK OF THE CITY OF ATLANTIC CITY; CARL A. VALORE, SR., CLERK OF ATLANTIC COUNTY; JOSEPH LAZAROW, MAYOR OF THE CITY OF ATLANTIC CITY, AND HORACE BRYANT, PIERRE HOLLINGSWORTH, EDMUND COLANZI AND EDWIN ROTH, COMMISSIONERS OF THE CITY OF ATLANTIC CITY, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 23, 1977—Decided March 14, 1977.

44

Before Judges MATTHEWS, SEIDMAN and HORN.

*Mr. David J. Goldberg* argued the cause for appellants (*Messrs. Warren, Goldberg & Berman,* of counsel; *Messrs. Land & Finifter,* attorneys).

*Mr. Adrian M. Foley, Jr.,* argued the cause for defendant (*Messrs. McElroy, Connell, Foley & Geiser and Messrs. Goldenberg & Mackler,* co-counsel; *Mr. R. Peter Connell* on the brief).

PER CURIAM. The primary question raised in this appeal is whether the recently enacted Open Public Meetings Act, *N. J. S. A.* 10:4–6 *et seq., L.* 1975, c. 231 (act), also

unofficially referred to as the "Sunshine Law," applies to a Faulkner Act charter commission (commission).[1] The secondary question is whether there was sufficient compliance with the act by the charter commission in the instant case if it does apply.

For the reasons which will be apparent hereinafter, we have decided that the act does not apply to charter commissions. Accordingly, the judgment entered below reflecting a contrary view is reversed.

Plaintiff in this action is a resident and taxpayer of the City of Atlantic City. He is also one of the five members of the charter commission. Defendants are the other four members of the commission, and also the county clerk, the mayor and commissioners of Atlantic City and the municipal clerk of Atlantic City. Only the four defendant members of the commission appeal. The other defendants have assumed a passive role in the proceedings.[2] They asserted below that they would abide by any judgment or order entered in the proceedings. Consequently, in referring to defendants for the purpose of this opinion we include as such only the four defendants who are members of the charter commission.

Because our conclusion rests primarily on the legal proposition that Faulkner Act charter commissions are not required to conform to the provisions of the act, it would serve no useful purpose to recite at length the events which led to this action. We recite only those which we feel may be helpful to a full understanding of the reasons for our conclusion.

---

[1] The Faulkner Act is officially designated as the Optional Municipal Charter Law, *N. J. S. A.* 40:69A-1 et seq. See *N. J. S. A.* 40:69A-210.

[2] The Charter Commission Report indicates that several city officials appeared at its hearings and "pointed out several 'advantages' of commission government." This was their only participation.

Shortly after the legislative enactment thereof in 1911 Atlantic City adopted by popular vote the commission form of government under the Walsh Act, *N. J. S. A.* 40:70–1 *et seq.; Keffer v. Gaskill,* 88 *N. J. L.* 77 (Sup. Ct. 1915). On May 11, 1976, pursuant to the Faulkner Act, *N. J. S. A.* 40:69A–1 and 2, the voters of Atlantic City elected a charter commission consisting of plaintiff and defendants to study the present charter of the city and to consider "a new charter or improvements in the present charter and to make recommendations thereon." Thereafter, numerous meetings of the commission were held preliminary to the filing of its report on September 3, 1976.[3]

It appears that commencing the early part of August 1976 the theretofore apparently normal relations between Polillo and the other commissioners deteriorated. At that time, after approximately 13 meetings, plaintiff for the first time complained that the commission had been violating the Open Public Meetings Act.

On September 23, 1976 plaintiff initiated this action by the filing of a complaint in lieu of prerogative writs, asserting in his complaint that the commission violated the act by failing to give adequate notice of meetings and otherwise failing to conform to the requirements of the act, and that such violations rendered "all actions taken by the Charter Study Commission voidable." See *N. J. S. A.* 10:4–15. He sought to restrain the submission of the commission's recommendation to a vote at the general election of November 2, 1976.

The hearing before the judge, which took place on October 14, 15, 18 and 19, consisted almost entirely of the introduction of testimony and other proofs as to the notices, agendas and minutes referrable to each of the commission

---

[3]The report was signed by the four defendant members of the commission with a statement that "Commissioner John J. Polillo [plaintiff] dissented and did not concur with the findings and recommendations contained herein."

meetings which preceded the filing of the commissioners' report. At the termination of the hearing the judge orally declared his findings — that the commission did, in fact, fail to adhere to the requirements of the act, so that the report filed by it was a nullity "and the issue will be stricken from the ballot on November 2nd next."

The judge determined that each and every meeting conducted by the commission violated the act, particularly *N. J. S. A.* 10:4-9 and 10, in one or more ways, including the failure to give "adequate" notice of meetings.[4] This appeal followed. On defendants' application we stayed the trial judge's order restraining the Clerk of Atlantic County from placing on the ballot for the November 2, 1976 election the recommendation of the commission that the voters adopt mayor-council Plan C. *N. J. S. A.* 40:69A-55 *et seq.* We also directed that the appeal be accelerated on the filing of supplemental briefs by the parties.

On November 2, 1976 the voters approved the recommenmendation of the commission by a vote of 7,808 to 5,565.

---

[4] *N. J. S. A.* 10:4-8d defines "adequate notice" as follows:

"Adequate notice" means written advance notice of at least 48 hours, giving the time, date, location and, to the extent known, the agenda of any regular, special, or rescheduled meeting, which notice shall accurately state whether formal action may or may not be taken and which shall be (1) prominently posted in at least one public place reserved for such or similar announcements, (2) mailed, telephoned, telegrammed, or hand delivered to at least two newspapers which newspapers shall be designated by the public body to receive such notices because they have the greatest likelihood of informing the public within the area of jurisdiction of the public body of such meetings, one of which shall be the official newspaper, where any such has been designated by the public body or if the public body has failed to so designate, where any has been designated by the governing body of the political subdivision whose geographic boundaries are coextensive with that of the public body and (3) filed with the clerk of the municipality when the public body's geographic boundaries are coextensive with that of a single municipality, * * *.

In enacting the Open Public Meetings Act the Legislature declared its findings and its avowed salutary policy as related to the instant case partly in the following words:

> The Legislature finds and declares that the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making of public bodies, is vital to the enhancement and proper functioning of the democratic process; * * * and hereby declares it to be the public policy of this State to insure the right of its citizens to have adequate advance notice of and the right to attend all meetings of public bodies at which any business affecting the public is discussed or acted upon in any way except only in those circumstances where otherwise the public interest would be clearly endangered or the personal privacy or guaranteed rights of individuals would be clearly in danger of unwarranted invasion.
>
> *       *       *       *       *       *       *       *
>
> The Legislature, therefore, declares that it is the understanding and intention of the Legislature that *in order to be covered by the provisions of this act a public body must be organized by law and be collectively empowered as a multi-member voting body and to spend public funds or affect persons' rights; that, therefore, informal or purely advisory bodies with no effective authority are not covered,* * * *. [*N. J. S. A.* 10:4–7; emphasis supplied]

"Public body" was stated to mean:

> * * * a commission, authority, board, council, committee or any other group of two or more persons organized under the laws of this State, and collectively *empowered as a voting body to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or collectively authorized to spend public funds* including the Legislature, but does not mean or include the judicial branch of the government, any grand or petit jury, any parole board or any agency or body acting in a parole capacity, the State Commission of Investigation or any political party committee organized under Title 19 of the Revised Statutes. [*N. J. S. A.* 10:4–8(a) ; emphasis supplied]

It follows from the quoted portions of the act, and especially from those phrases which we have emphasized, that apart from the expressly named bodies (judicial branch, juries, parole boards, *etc.*) all other public bodies are included within the terms of the act except those not "col-

lectively empowered * * * to perform a public governmental function affecting the rights, duties, obligations, privileges, benefits, or other legal relations of any person, or * * * authorized to spend public funds."

We hold that Faulkner Act charter commissions are such as to exclude them from the operation of the act. Such commissions neither (1) perform a public function which affects the rights, duties, obligations, privileges, benefits or other legal relations of any person within the meaning and intent of the act, nor (2) are authorized to spend public funds.

We first refer to the matter of authority to spend public funds. *N. J. S. A.* 40:69A–8 provides:

Members of the charter commission shall serve without compensation but shall be reimbursed by the municipality for their necessary expenses incurred in the performance of their duties.

Within the limits of such appropriations * * * as shall be made available * * *, the charter commission may appoint * * * consultants and clerical and other assistants * * * and may fix a reasonable compensation to be paid such consultants and clerical and other assistants.

Plaintiff contends that the foregoing statute brings the commission within the act because it authorizes the commission to "spend public funds."

We perceive a meaningful difference between the power to spend public funds and being reimbursed for expenses necessary to carry out the commission's specified public duties. If it were to mean being reimbursed for expenses, then practically all advisory groups would have to be considered as public bodies under this act. This could not have been the intent of the Legislature.

We doubt the existence of a public body whose necessary expenses are not reimbursable from public funds either by express legislative provision for reimbursement or by the implied authority of the political subdivision or body which it serves. Faulkner Act charter commissions are not empowered to spend public funds; they cannot decide to ap-

propriate any sum of money to purchase property or to secure services beyond those associated strictly with their limited functions. They may only be reimbursed for their necessary expenses. In effect, governing bodies "spend" the funds by reimbursing such charter commissions.

To illustrate that there is a difference between spending public funds and being reimbursed for necessary expenses we consider the "sunshine" statutes dealt with in *Laman v. McCord*, 245 *Ark.* 401, 432 *S. W.* 2d 753 (Sup. Ct. 1968), and *Raton Public Service Co. v. Hobbes*, 76 *N. M.* 535, 417 *P.* 2d 32 (Sup. Ct. 1966). Unlike our statute, the Arkansas and the New Mexico acts require public meetings for all commissions *supported* by public funds. We perceive an intentional difference between having the power to spend public funds (New Jersey) and being supported by public funds (Arkansas and New Mexico).

We turn now to consideration of the other factor — the question of whether the commission's function affects the rights, duties, obligations, privileges, benefits or other legal relations of any person. We at once recognize that the word "affecting" is one of common usage with the widest conceivable scope. 2A *C. J. S.* 430 (1972). It may mean anything from "touching" to "working a change in." *Op. cit.* at 431. The intended meaning must be determined from the spirit and objectives of the Act as well as its specific context. *N. J. Builders, etc., Ass'n v. Blair*, 60 *N. J.* 330 (1972) ; *Germann v. Matriss*, 55 *N. J.* 193 (1970).

The spirit and objective of the act are expressly declared in *N. J. S. A.* 10:4–7 to be to secure "the right of the public to be present at all meetings of public bodies, and to witness in full detail all phases of the deliberation, policy formulation, and decision making" of such bodies. A charter commission does not formulate policy. Its decision only goes to what change in form of municipal government, if any, it will recommend. It appears to fill the description of being a "purely advisory" body "with no effective authority." *N. J. S. A.* 10:4–7.

The precursor of the present act was the Open Public Meetings Law which was enacted in 1960. That statute, repealed upon the effective date of the present act, with few exceptions included all public bodies. It was apparently deemed inadequate because generally it did not provide for advance notice to the public of the times and places of meetings of public bodies. A public body was defined as a commission, authority, board, council, committee and any other group of two or more persons organized under the law of this State to "perform a public governmental function by official action." Official action was stated to mean a determination made by vote.

In 1963 the "Right to Know Law," *N. J. S. A.* 47:1A–1 *et seq.*, was enacted. Under this statute, in accordance with the legislative stated public policy, public records were made accessible to all citizens, whether or not they are able to demonstrate any personal or particular interest in the material which they seek to examine. In this respect the door was open wider than at common law, no longer requiring a citizen to first demonstrate a personal or particular interest in the material sought to be examined. *Irval Realty v. Bd. of Pub. Util. Comm'rs.,* 61 *N. J.* 366, 372 (1972). The Right to Know Law (in *N. J. S. A.* 47:1A–2) referred to the records maintained by any board, body, agency, department, commission or official of the State or of any political subdivision thereof, or by any public board, body, commission or authority created pursuant to law. The sole exception was contained in *N. J. S. A.* 47:1A–3, with reference to records of investigations in progress. Thus, this statute also was applicable to all "public bodies."

Assembly Bill 1030, which as amended was enacted as the Open Public Meetings Act, defined "public body" substantially as it appears in the above-quoted portion of *N. J. S. A.* 10:4–8(a), except for the addition of the emphasized phrases. It is therefore observed that the Legislature in revising the definition of "public body" from that which had existed in the earlier statutes adopted in 1960 and 1963,

determined to eliminate or exclude from the operation of the statute some public bodies which theretofore were not excluded. As a consequence of this change, earlier decisions of our courts are not pertinent since the definition of "public body" has been narrowed by the present act. See cases that have applied *N. J. S. A.* 10:4–1 *et seq.*, now repealed, to zoning boards of adjustment — *Kramer v. Sea Girt Bd. of Adj.*, 80 *N. J. Super.* 454 (Law Div. 1963), aff'd 45 *N. J.* 268 (1965); *Wolf v. Park Ridge Bd. of Adj.*, 79 *N. J. Super.* 546 (App. Div. 1963); those applied to planning boards — *Tidewater Oil Co. v. Carteret Mayor, etc.*, 80 *N. J. Super.* 283 (Law Div. 1963), rev'd on other grounds, 44 *N. J.* 338 (1965); and applied to welfare boards — *Thomas v. Bergen Cty. Welfare Bd.*, 122 *N. J. Super.* 371 (App. Div. 1973). See also, as applied to a board of education — *Schults v. Teaneck Bd. of Ed.*, 86 *N. J. Super.* 29 (App. Div. 1964), aff'd 45 *N. J.* 2 (1965).

No doubt, even under the present act all of these bodies would be subject to its requirements. Each respectively has the authority to spend public money or to affect rights, privileges or benefits in the sense of compelling a change by its own action or decision or both. This is not so in the case of charter commissions, whose function is only to "advise" or recommend.

The limited authority of a charter commission was discussed in *Bucino v. Malone,* 12 *N. J.* 330 (1953). In considering whether the Faulkner Act was constitutional at a time before *N. J. S. A.* 10:4–6 *et seq.*, or its predecessor had been enacted, the court said:

This is far different from the situation under the Faulkner Act, where first of all the voters always have the alternative procedural method of petition and referendum whereby they can compel the question of acceptance of one of the 14 plans to be placed on the ballot. Thus the fact that the charter commission may recommend no plan at all does not frustrate their efforts at changing their form of government, for they can still bring the plan they prefer to a vote by petition under the act's alternative procedural method. Secondly, no matter by which method the question is submitted to the voters,

whether through the instrumentality of the charter commission or by petition and referendum, the optional plan of government becomes effective only through its adoption by the electorate. *The charter commission has no power to legislate.* The act sets up 14 plans, each complete in itself. *The commission can only study the various plans and then report its recommendations to the people.* The function of the commissioners is purely that of selection and recommendation, not of legislation or adoption.

The charter commission is vested with no powers of government. *It cannot impose its will upon the people.* Its findings and recommendations have none of the force of legislation. *The adoption of a plan rests entirely in the hands of the voters.* The members of the charter commission are their agents, chosen because of their ability to aid in the selection of a desirable plan of municipal government. * * * [at 339–340 emphasis supplied]

A review of the provisions of the Faulkner Act relating to the duties of a charter commission bears out the comment of the Supreme Court in *Bucino v. Malone, supra.* The commission has only the power to recommend as to the form of government which is to be placed upon the ballot. The citizens of the municipality are free to vote against the recommendation. The commission's report has no force of law and in no way affects persons' rights, privileges or benefits. The report may influence people to vote either for or against a new form of government, but in no way does it compel a change. While the commission's recommendation is placed on the ballot, any of the alternate plans of government enumerated in the act can be placed on the ballot, voted on and approved by qualified voters of the municipality without utilizing a charter commission. *N. J. S. A.* 40:69A–18.

We may assume that the Legislature was aware of the provisions of the Faulkner Act — that charter commissions were directed to hold public hearings and "sponsor public forums and generally * * * provide for the widest possible public information and discussion respecting the purposes and progress of [their] work." *N. J. S. A.* 40:69A–9. *Mimkon v. Ford,* 66 *N. J.* 426, 433 (1975) ; *State v. Federanko,* 26 *N. J.* 119, 129 (1958). In the instant case plaintiff did not attack the validity of the commission's recommendation on the

ground that it was deficient in complying with the Faulkner Act provisions for giving public notice, only that it did not comply with the Open Public Meetings Act. We surmise that plaintiff was satisfied that the Faulkner Act notice requirements were followed. For the reason already mentioned, we need not recount the activities of the commission in generating public interest and participation. It will suffice to mention that between the inauguration of the commission in May 1976 and the filing of its report less than six months later it had held 27 meetings, of which three were noted as emergency meetings without notice. Other than the emergency meetings, they were widely publicized.[5] Numerous citizens, including municipal officials of Atlantic City and from outside the city, were interviewed. In no instance was there an intentional attempt to meet secretly or without some notice to the public. See *Showell v. Horn*, 65 *N. J. Super*. 374 (Law Div. 1961).

We agree with defendants' contention that if *N. J. S. A.* 10:4–6 *et seq.* is held to apply to commissions created pursuant to the Faulkner Act the result will be to impliedly repeal part of *N. J. S. A.* 40:69A–9, which allows the commission to hold private hearings. Repeals by implication are not favored and a strong presumption against them exists. *Loboda v. Clark Tp.*, 40 *N. J.* 424 (1963). That no change was made in the Faulkner Act which permits charter commissions to hold "private hearings" at their discretion is a further indication of the legislative recognition that the Open Public Meetings Act was not intended to apply to charter commissions.

The life of a charter commission is comparatively short. It is required to perform its complete function and duties within an interval of nine months from the date its members are elected. *N. J. S. A.* 40:69A–10. It is discharged after

---

[5] Meetings were held May 13, 28; June 1, 8, 17, 21, 29; July 15, 20, 22, 27, 29; August 3, 5, 10, 12, 17, 19, 24, 25, 26, 27, 30, 31; September 1, 2, 3.

its report is filed. *N. J. S. A.* 40:69A–11. The act contemplates permanent rather than temporary public bodies. This is implicit in *N. J. S. A.* 10:4–18, which provides for the posting of meeting schedules of included public bodies for the ensuing year within seven days following the annual organization or reorganization meeting, or if there is no organization meeting, then by January 10 of such year.

We do not accept plaintiff's contention that the act be liberally construed (*N. J. S. A.* 10:4–21) and so requires a construction that the statute is operative as to charter commissions. Although the Act should be construed liberally, as expressly mandated, in the view that we take this statutory directive is not being ignored. A liberal construction of the act does not require that its terms should effect an unintended result so as to make it applicable to public bodies which were not intended to be controlled thereby.

At the hearing before the trial court defendants' attorney conceded that the act was applicable to the commission. We are satisfied that this concession is without effect for several reasons. First, when the statement was made by counsel plaintiff had already presented his arguments and the judge had already ruled that the act was applicable. No prejudice or reliance could have resulted from the statement. Second, the concession was as to a matter of law. This differentiates it from a stipulation of fact.

In relying upon *State v. Atlantic City Electric Co.*, 23 *N. J.* 259 (1957), plaintiff fails to observe the distinction between a stipulation as to a matter of fact and as to a matter of law. That case was concerned with a stipulation as to facts. The court said in reference to the stipulation: "The defendant should not be permitted upon appeal to alter its interpretation of the facts upon which the issue was framed and which has legitimately been relied upon by the State in its conduct of the cause." 23 *N. J.* at 264.

In *Schulz v. State Bd. of Ed.*, 132 *N. J. L.* 345 (E. & A. 1945), the court clearly held that stipulations as to law were not binding upon it, in stating:

\* \* \* We accept the facts as stipulated. We disregard the stipulation as to the law. \* \* \* The law as determined herein will apply, not only to the present litigants, but to all other persons in like relationship confronted with a like state of facts. Our view, and not the agreement of counsel, must control the determination. [at 349]

See also *Fivehouse v. Passaic Valley Water Comm'n,* 127 *N. J. Super.* 451, 457 (App. Div. 1974), certif. den. 65 *N. J.* 565 (1974); *Tibbs v. Boemi,* 109 *N. J. Super.* 200, 204 (App. Div. 1970), aff'd o.b. 55 *N. J.* 531 (1970).

For the foregoing reasons the judgment entered below is reversed.