159 N.J. Super. 380 (1978)
388 A.2d 254
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
NECLES ELYSEE, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 21, 1978.
Decided May 12, 1978.
*382 Before Judges LYNCH. CRANE and LARNER.
*383 Mr. John S. Redden, Special Deputy Attorney General, argued the cause for appellant (Mr. Donald S. Coburn, Acting Essex County Prosecutor, attorney; Mr. Leonard D. Ronco, former Acting Essex County Prosecutor, and Mr. Marc J. Friedman, Deputy Attorney General, of counsel).
Ms. Lois A. DeJulio, Assistant Deputy Public Defender, argued the cause for respondent (Mr. Stanley C. Van Ness, Public Defender, attorney).
The opinion of the court was delivered by LARNER, J.A.D.
We granted leave to the State to appeal a pretrial ruling which held that an oral and a written statement of defendant would not be admissible at trial. Pursuant to R. 2:11-2, the matter was expedited and considered by this court after briefs and oral argument addressed to the merits of the appeal.

I
Preliminarily, we find it necessary to discuss the procedural history below because of defendant's contention that the State has no right of appeal and that leave was improvidently granted.
With the consent of both sides the trial judge conducted a voir dire hearing on the admissibility of the statements on the day of trial, prior to the commencement of the actual trial and before the jury was selected. The hearing took place after an informal "stipulation" by counsel off the record to the effect that "jeopardy would attach."
We have been advised that a practice has developed in Essex County and perhaps in other counties whereby the court asks for such a stipulation as a device to circumvent the normal procedure requiring an evidentiary hearing on the admissibility of defendant's statements to be held during trial. See State v. Yough, 49 N.J. 587, 590 (1967). Manifestly, such a charade has no rational basis and should be discontinued forthwith.
*384 In fact, the stipulation, though agreed upon by both parties, is of no legal consequence in the determination of the State's right to seek leave to appeal. Such a right is granted to the State from an adverse ruling on an interlocutory order entered before trial by R. 2:3-1(b) and R. 2:5-6(a).
Defendant contends, however, that the mouthing of the words "jeopardy attached" in the guise of a stipulation estops the State from taking an appeal with the same force and effect as if jeopardy had actually attached by the commencement of a trial on the merits. Compare State v. Rechtschaffer, 70 N.J. 395 (1976); State v. Lynch, 155 N.J. Super. 431 (App. Div. 1978); State v. Laganella, 144 N.J. Super. 268, 286-290 (App. Div. 1976), app. dism. 74 N.J. 256 (1977). This contention is clearly without merit.
Neither the State nor the court is bound by a stipulation of a matter of law which is contrary to controlling law on the subject. See Schulz v. State Bd. of Ed., 132 N.J.L. 345, 349 (E. & A. 1945); Schere v. Freehold Tp., 150 N.J. Super. 404, 408 (App. Div. 1977); Polillo v. Grossman, 148 N.J. Super. 43, 55-56 (App. Div.) rev'd on other grounds 74 N.J. 562 (1977); Tibbs v. Boemi, 109 N.J. Super. 200, 204 (App. Div.), aff'd o.b. 55 N.J. 531 (1970).
Furthermore, fairness and justice dictate that we disregard a stipulation which not only contravenes applicable law but also represents a studied effort to circumvent normal practice.
Aside from the question of the alleged double jeopardy bar to an appeal, there is no impediment to the consideration of the merits of this case on the appeal of the State. It is true that in State v. Yough, supra, the Supreme Court stated that pretrial exclusionary motions addressed to confessions should not be entertained until and unless the rules of practice are amended through formal adoption by the Supreme Court. See also, State v. Green, 49 N.J. 244 (1967); State v. Travis, 49 N.J. 428, 431, n. 1 (1967). *385 Nevertheless, four years later, without new rules on the subject, Justice Jacobs in State v. Graham, 59 N.J. 366 (1971), pointed out:
No pertinent formal rules have been promulgated to date and accordingly the authorized practice still is to hear such applications at rather than before trial. We understand that trial judges, in the exercise of their discretion, have occasionally heard such applications on the trial date but before actual selection of the jury and that after making their determinations they have immediately proceeded with the trial without any fragmentation or interruption. On a broad view, that course may be justified as representing a determination at rather than before trial within the contemplation of Green, Travis and Yough; in any event, we do not now disapprove it since it does serve to avoid the waste and inconvenience of having the members of a jury confined while the trial judge, in their absence, conducts a preliminary Miranda hearing or the like. [at 372-373]
Significantly, in State v. Yough, supra; State v. Graham, supra and State v. Godfrey, 131 N.J. Super. 168 (App. Div. 1974), aff'd o.b. 67 N.J. 267 (1975), the court considered the merits of the State's appeal from the suppression of defendant's confession despite the procedural aberration from the requirement that the motion be considered during trial. We shall proceed to do the same in this case.
We do, however, take this opportunity to suggest that our Supreme Court Criminal Practice Committee undertake to consider and recommend a rule change which would permit a motion to suppress a statement or confession of a defendant to be heard before trial at the discretion of the trial judge. Since a determination whether a confession is or is not admissible often forecasts the result of the prosecution, it would appear logical and practical to equate such a motion with one to suppress evidence because of an unlawful search and seizure, which must be made before trial in the absence of unusual circumstances. R. 3:5-7. Although cases may arise where the decision on admissibility of a statement, oral or written, may be better reserved for consideration in the context of the full panorama of facts presented at trial, the procedural question whether to hear *386 the motion before trial should be left to the discretion of the court.
We recognize that the adoption of such a rule would permit interlocutory appeals by the State where the matter has been determined prior to trial, in contrast to the inability of the State to review an adverse ruling when the matter is determined at trial. Although the suggested procedural change may produce more interlocutory appeals, there is no cogent reason why the State should not have the opportunity to review a ruling which may go to the heart of its case, subject of course to control by the Appellate Division which can deny leave to appeal in nonmeritorious cases.

II
In the process of the investigation of the crime, Detectives Goodwyn and Clark proceeded to the home of defendant on November 10, 1977. When the door was opened they identified themselves and said to defendant, "I think you know why we're here." Defendant was shaking and appeared to be nervous. He was directed to get dressed and accompany the detectives to their automobile, to be transported to Police Headquarters.
Detective Goodwyn testified that while defendant was seated in the back seat "he said that Frank [the victim] was too much involved with his wife, or something to that effect, and he hit him." This was a volunteered remark, not made in response to any interrogation; and it was followed by Detective Goodwyn's comment that they would talk to defendant when they reached headquarters. The detective's testimony relating to the oral statement remained uncontradicted either by cross-examination or the testimony of defendant.
The trial judge held that the oral statement was inadmissible because police custody per se required Miranda warnings as a prerequisite to admissibility. This ruling was clearly erroneous.
*387 The Miranda rule does not come into play unless a statement is the product of custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 478, 86 S.Ct. 1602, 16 L.Ed.2d 694, 726 (1966); State v. Barnes, 54 N.J. 1, 5-6 (1969), cert. den. 396 U.S. 1029, 90 S.Ct. 580, 24 L.Ed.2d 525 (1970); State v. Gallicchio, 51 N.J. 313, 320, cert. den. 393 U.S. 912, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); State v. Gosser, 50 N.J. 438, 446 (1967), cert. den. 390 U.S. 1035, 88 S.Ct. 1434, 20 L.Ed.2d 295 (1968). In the absence of interrogation, a volunteered or spontaneous remark by a suspect is admissible in evidence regardless of the absence of Miranda warnings. Defendant's reliance upon Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), in an effort to spell out the presence of interrogation in this case is far-fetched and without merit. There is no evidence whatever in this record which supports a conclusion that the detectives did or said anything designed to elicit incriminating statements or to place defendant under compulsion to speak. See State v. Cunningham, 153 N.J. Super. 350 (App. Div. 1977); State v. Johnson, 106 N.J. Super. 295, 301-302 (App. Div. 1969) (Kilkenny, J., dissenting), rev'd on dissenting opinion 55 N.J. 331 (1970).

III
We next turn to the question of the propriety of the trial judges exclusion of the written statement given by defendant at police headquarters through an interpreter who translated the Miranda warnings and the questions into defendant's native tongue. The thesis of the determination was that the State had failed to sustain its burden of showing that defendant "knowingly and willingly waived his right on Miranda." This finding was interlaced with the following references:
* * * [W]e have the interpreter injecting religion into the discussion and it may well be that that injection of religion subtly *388 coerced this accused. * * * He may well have appreciated, but under the trauma of being arrested and invocation of God and religion I'm satisfied that the State has not met its burden. * * *
It is difficult to fathom whether the basis of the judge's ruling was the finding that defendant did not understand his rights as conveyed to him by the interpreter, or that the statement was involuntarily given, or, as articulated in a supplemental opinion, that the interpreter failed to advise him of his right to remain silent. That supplemental opinion concludes:
I find, therefore, that there has to be an actual communication in a meaningful sense of the Miranda Rights in order that a defendant such as Elysee can be later said to have waived those rights by the giving of S-2. If neither the interpreter nor the communicant understands the significance of what is being said, then the constitutional rights of the accused were not revealed.
The interpreter had no association with the police and had no interest in the case or the parties. She was a young woman employed as an interviewer in a department of the City of Newark, who was born and educated through the college level in Haiti, which is defendant's native country. She was fully qualified with respect to knowledge of Creole, French and English, and conducted the translation in Creole which admittedly is the language spoken and understood by defendant. She testified at the hearing that she was requested by the police to act as an interpreter in a murder case in connection with the questioning of a suspect. After a preliminary conversation with defendant, she concluded that he spoke and understood Creole and she then conducted all her communications with defendant in that language.
Prior to the questioning she translated accurately and truthfully into Creole the "Preamble to Signed Statements," which in substance contains the Miranda warnings as well as a waiver which states that the individual to be interrogated has been advised of his rights as outlined, and is willing to make a statement. It also provides: "I do not want a *389 lawyer at this time but understand that I may have one at any time I so desire. I understand that I may stop answering questions at any time."
The interpreter testified that defendant said he understood the preamble, which she read to him two times at the request of the police, after which he signed the document, including the waiver, and she signed as a witness. Thereafter she proceeded to translate each question by the police into Creole and in turn translated his response from Creole to English. The two-page statement was typed in the form of questions and answers as presented and was ultimately signed by defendant.
She also testified that at no time did defendant ask for a lawyer, and that he indicated he did not want a lawyer. She remembered specifically telling him that if he could not afford a lawyer, one would be given to him.
During the process of taking the statement, with the record unclear as to the specific point of time, the interpreter entered into a conversation with defendant on her own, without any prompting by the police. In this conversation she told defendant that she was a Jehovah's Witness and asked him, "Don't you feel guilty  you did that * * *? Do you have the right to do that?" when she learned from his answers that he had killed a cousin.
Defendant's testimony at the voir dire hearing is enlightening. He took the position under oath that he did not understand what the interpreter told him, and that she told him to say "all right, yes" to everything and sign the document. He allegedly complied by repeatedly answering "yes." "All the answers were `oui' and she said `yes.'" In fact, he stated under oath, "I answered what she told me, what she asked me to." He also testified that he speaks only Creole and that the interpreter did not explain matters to him in his Creole.
Furthermore, as to the preamble and waiver, he testified that she told him nothing before he signed. Shortly thereafter he modified this response by testifying, "She just *390 read the paper and she tried to explain to me. I say I didn't understand, and she told me `You don't have to understand. Just say yes and sign.'"
At another point he stated, "I didn't talk. I keep silence because they told me anything I say can be against me."
It is highly significant that the trial judge made explicit findings as to the credibility of defendant. At one point in the record he stated:
Assume for the moment that I reject the testimony of Elysee as being incredulous and deliberately deceiptful [sic] because of certain statements he made yesterday which are incredulous to me and therefore I find him to be a liar.
At another point the judge noted that defendant lied when he testified that he does not speak or understand one word of English. And in his concluding findings he stated:
Let me tell you I'll make my findings as to the credibility of the accused. I don't believe him because I believe he lied deliberately on the stand yesterday as to the extent although meager of his ability to understand and speak English. I believe he lied when he denied giving statements to the police through the interpreter and he would have us believe that all he did was say yes to the interpreter and she would in effect say yes and that no information was supplied by him and at the same time we note in a statement that it is impossible for me to believe that all of a sudden Miss Louissant without any information from the accused knew that he was born on January 13, 1915 in Laogon (phonetic), Haiti and that he had been in the States since March of 1970 and has been at his present address since August of 1977 and that with regard to the particular incident complained of on November 4, 1977 that the alleged murder occurred in the locker when he was getting undressed. This woman did not know him at all. She was not a relative, she happened to be a fellow country person from Haiti, but she certainly could not have just invented that information nor did the police I suspect provide that information so the fact that he gets on the stand yesterday and tells us, tells me particularly that he knows not one word of English, that he did not say anything to her except yes is incredulous. * * *
Nevertheless, apparently the judge found that the statement was coerced or involuntary because of the following *391 elements: Defendant was 63 years of age, undereducated and in this country for only seven years, and the volunteered reference to religion by the interpreter reminding defendant of the prohibition of murder "in a religious sense" produced an "improper chilling effect which has disrupted this man's constitutional rights."
After a careful review of the record herein in light of the trial judge's finding as to the lack of credibility of defendant, we reject the conclusion that defendant did not voluntarily and understandably waive his constitutional rights to remain silent and to have the assistance of counsel. We are satisfied that the determination by the trial judge could not reasonably have been reached on sufficient credible evidence in the record.
While generally an appellate court will not invoke the power to overturn ordinary factfindings by the trial judge, the state of this record and the nature of the findings below call for appellate intervention and correction. See State v. Johnson, 42 N.J. 146, 162 (1964). This is particularly necessary herein where the findings are intertwined with legal conclusions and implications which have doubtful validity. See State v. Yough, supra, 49 N.J. at 596; State v. Godfrey, supra, 131 N.J. Super at 174.
The State has borne the burden cast upon it to establish the voluntariness of the statement, the communication of Miranda warnings and the understanding waiver by defendant. To accept the trial judge's conclusion on the record presented herein would result in the total frustration of justice merely because a defendant who is not fully conversant with the English language interjects the ploy that he did not understand the Miranda warnings and his waiver of rights despite a credible picture of a full translation thereof. And what is most apparent about the impropriety of the judge's conclusion is his concomitant finding as to the utter lack of credibility of defendant  a finding with which we are in full accord.
*392 The judge's reliance upon the incidental reference to God or religion by the interpreter during the police questioning is wholly misplaced. There is no evidence of unfair or improper tactics by police involving the invocation of religion or other facets of persuasion from which a court could conclude that the giving of the statement was coerced so as to be inadmissible. The case of Brewer v. Williams, supra, which involved, among other factors, the so-called "Christian burial speech" by the detective, is clearly distinguishable. We find that the incidental reference to defendant's guilt and religious beliefs by the interpreter, without complicity by the police, was of no significance in the decision of defendant to give a statement. There is no evidence in the record that these remarks caused, coerced or pressured defendant to answer the questions put to him by the detectives. The judge's conclusion that they had "an improper chilling effect which has disrupted this man's constitutional rights" is without foundation in fact or law.
Reversed.
CRANE, J.A.D. (concurring).
I agree with the conclusions expressed in the majority opinion that the trial judge was in error in excluding defendant's statements. I do not agree, however, with the suggestion that the rules of criminal practice should be amended to permit the question of whether a defendant's statement should be admitted to be decided before trial. Such a practice has been criticized in State v. Yough, 49 N.J. 587, 590 (1967), and it has been held that a defendant does not have a constitutional right to have that question decided by the trial judge in advance of trial. State v. Green, 49 N.J. 244 (1967).
Some inconvenience to jurors may be avoided by holding hearings in advance of trial. See State v. Graham, 59 N.J. 366, 372-373 (1971). However, I am concerned that there will be a proliferation of motions to stay trials and motions for leave to appeal which would result in the fragmentation of trials. There are many other questions of admissibility of *393 evidence which are required to be decided by the trial judge during the course of the trial. Included among them are the admissibility of testimony about the prior identification of defendant, State v. Sinclair, 49 N.J. 525, 545 (1967); the competency of a witness to testify, State v. Butler, 27 N.J. 560, 603 (1958), and the admissibility of a defendant's prior criminal record, State v. Sands, 76 N.J. 127 (1978). If admissibility of a confession is to be decided in a separate proceeding in advance of trial, why should not every evidential question be so decided so that the opportunity for appellate review may be preserved? I would not depart from the strong policy in favor of preserving the unity of the trial process. East Orange v. Palmer, 52 N.J. 329, 334 (1968); Hudson v. Hudson, 36 N.J. 549, 552-553 (1962); Frantzen v. Howard, 132 N.J. Super. 226, 227-228 (App. Div. 1975).