BARRY M. DECHTMAN, INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT, v. SID-PAUL CORPORATION, A NEW JERSEY CORPORATION, D/B/A LAUREL GARDENS, PAUL ZITO AND ROSALIE C. ZITO, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, GANDRIA REALTY, INC., A NEW JERSEY CORPORATION, DEFENDANT, LAUREL GARDENS ASSOCIATES, A PARTNERSHIP, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 16, 1981—Decided April 8, 1981.

Before Judges SEIDMAN, ANTELL and LANE.

*Alfred C. Clapp* argued the cause for appellants and cross-respondents Sidpaul Corporation, Paul Zito and Rosalie C. Zito (*Anschelewitz, Barr, Ansell & Bonello*, attorneys, and *Clapp & Eisenberg* of counsel; *Alfred C. Clapp* and *John L. Bonello* on the brief).

*David N. Ravin* argued the cause for respondent and cross-appellant Laurel Gardens Associates (*Ravin & Kesselhaut*, attorneys; *Bernard Schenkler* and *David N. Ravin* on the brief).

*Robert J. Cirafesi* argued the cause for respondent and cross-appellant Barry M. Dechtman, Inc. (*Wilentz, Goldman & Spitzer*, attorneys.

The opinion of the court was delivered by

LANE, J. A. D.

Defendants Sidpaul Corporation (Sidpaul), Paul Zito and Rosalie Zito appeal from the final judgment of the Superior Court of New Jersey, Chancery Division, in favor of codefendant Laurel Gardens Associates directing specific performance of a contract for the sale of real property and dismissing their claim for damages for breach of contract. Plaintiff cross-appeals from so much of the judgment as holds that the purchaser, Laurel Gardens, is responsible for the real estate commission and denying interest on the commission. Laurel Gardens Associates appeals from so much of the judgment as fixes the date for adjustments at the closing at 30 days after the judgment rather than the original closing date fixed by the parties of November 9, 1977 and holds the purchaser responsible for the real estate commission rather than the seller. The primary issue is whether the contract involved omits a term so essential that the contract cannot be recovered upon in equity or at law. We reverse and remand for the entry of judgment dismissing all claims that the parties have against each other.

Barry M. Dechtman, Inc. filed suit to recover real estate commissions in the amount of $200,000 from Sidpaul and Paul Zito, damages against Paul Zito and Rosalie C. Zito for wrongfully preventing defendant Sidpaul from closing under a contract of sale, and damages from Gandria Realty, Inc. for failing to close title and depriving plaintiff of its real estate commission. Laurel Gardens Associates and Gandria Realty, Inc. crossclaimed against Paul Zito, Rosalie C. Zito and Sidpaul to recover compensatory and punitive damages for breach of a contract of sale, for specific performance of the contract of sale and seeking indemnification for any sums that might be found due to plaintiff. Sidpaul, Paul Zito and Rosalie C. Zito crossclaimed against Gandria Realty, Inc. and Laurel Gardens Associates seeking indemnification for any sums found to be due to plaintiff, damages for breach of contract and compensatory and punitive damages for slander of title. The trial court entered judgment:

(1) Plaintiff's commission be paid by Laurel Gardens Associates.

(2) Sidpaul specifically perform the contract of sale with the closing date 30 days from the date of the judgment and adjustments to be made at the date of closing.

(3) The purchase money second mortgage to be taken back by the seller provide that a declaration of default by United States Savings Bank by reason of a "due-on-sale" clause in the first mortgage shall not constitute a default on the second mortgage provided the purchaser continues to tender payment of the monthly sums due on the second mortgage and actively contests any declaration of default or foreclosure proceedings instituted by the first mortgagee and further provided that in the event foreclosure proceedings are instituted by the first mortgagee the seller may apply to the court for just and reasonable safeguards in the event the purchaser is unsuccessful in the foreclosure proceedings.

(4) That in default of closing a certified copy of the judgment may be recorded in the office of the County Clerk which will constitute a transfer and conveyance of the real and personal property of Sidpaul in accordance with the contract of sale with the buyer depositing with the clerk of the Superior Court all monies which were due and payable at the closing date together with a note constituting a personal guarantee by Barry M. Dechtman and a purchase money mortgage in an amount and form as contemplated by the contract of sale as amended by the judgment.

(5) Denying plaintiff's application for interest on the real estate commission.

Dr. Zito is principal stockholder and president of Sidpaul, the owner of Laurel Gardens, a 237-apartment complex in Eatontown, New Jersey. On behalf of Laurel Gardens he signed a listing agreement with plaintiff on November 17, 1976. The listing price was $3,550,000. There was a first mortgage dated August 2, 1972 in the amount of $2,300,000 held by United States Savings Bank of Newark, N.J. By November 1977 the principal amount had been reduced to $2,175,000. The listing agreement stated that the cash required was a total of $800,000, of which $25,000 would be paid at the time the contract of sale was signed.

The first mortgage provided for monthly installments of principal and interest at 8% a year to be paid in the amount of $17,250. Any unpaid balance and interest would be paid 15 years from the date of the mortgage. The mortgage provided that the loan would be "closed for seven (7) years" and thereafter could be paid in full with a penalty of 4% of the unpaid balance in the eighth year, which penalty would decline one-half of 1% each year thereafter until it reached 1%, which would be maintained until expiration of the mortgage. There was a typewritten provision in the mortgage providing that it would become due and payable "in the event there is a transfer of ownership of the stock of the Borrower from those presently holding the same without the consent of the Bank excepting only by the laws of descent and distribution." The body of the mortgage provided that if there was any change in the ownership of the mortgage property, the principal sum with accrued interest "shall, at the option of the Mortgagee, become due and payable immediately, although the period above limited for the payment thereof may not have expired, anything herein contained to the contrary notwithstanding; . . . ."

Barry M. Dechtman and another person decided to purchase Laurel Gardens. For that purpose they formed Gandria Realty, Inc. Dechtman revealed to Zito his interest in purchasing the property and conferred with Zito about the terms of the purchase. Dechtman then engaged an attorney, who drew a pro-

posed contract which was dated February 14, 1977. The draft provided a purchase price of $1,300,000 over the balance due on the mortgage, which was in the approximate amount of $2,175,-000. The sum of $25,000 was to be paid at the signing of the contract, a further sum of $475,000 on closing and the purchaser was to execute and deliver a mortgage of $800,000 at a rate of 6% interest. Paragraph 11 of the draft provided in the first sentence that it was expressly made subject to the purchaser's obtaining within 60 days a mortgage commitment from a financial institution on terms satisfactory to the purchaser. In the event purchaser was unable to obtain the mortgage commitment or the contingency was not waived by the purchaser, then, at the option of the purchaser, the contract could be terminated. The parties met with their attorneys and accountants to confer about the terms of the contract, as a result of which a second contract was prepared by plaintiff's attorney. This form of contract provided for a purchase price of $1,100,000 subject to the balance due on the mortgage. The purchase price was to be paid $25,000 at the signing of the contract, $275,000 on closing and by a mortgage in the amount of $800,000. Paragraph 11 was changed to read:

> This Contract is expressly made subject to the following: (a) Approval by United States Savings Bank of Newark, New Jersey, of sale to Purchaser as contemplated herein on or before the date fixed for closing of title hereunder, (b) Purchaser obtaining on or before the date fixed for closing of title hereunder, a mortgage commitment from a financial institution on terms and conditions satisfactory to Purchaser. In the event Purchaser is unable to obtain (a) and (b) above within the time period set forth herein, or said contingencies are not waived by Purchaser, then and in that event, at the option of Purchaser, on written notice to the other party, this Agreement may be terminated and upon such termination, there shall be no further liability one party to the other except the return of the deposit money paid hereunder.

There was then drawn a third draft of the contract, which provided for the same purchase price. Certain changes were made in the provision for the purchase money mortgage. Paragraph 11 was retained. The contract of sale ultimately signed was then prepared by plaintiff's attorney. That contract provided that the purchase price was $3,275,000. The purchase

price was to be paid $25,000 on the signing of the contract, $275,000 on the closing of title and by the execution of a purchase money mortgage in the amount of $800,000. The provision for the purchase money mortgage stated that it would contain a clause that "a default in any first mortgage encumbering the premises shall be deemed a default under this mortgage . . . ." Paragraph 11 was changed to provide:

> This Contract is expressly made subject to the following: (a) Approval by United States Savings Bank of Newark, New Jersey, of sale to Purchaser as contemplated herein on or before the date fixed for closing of title hereunder. In the event Purchaser is unable to obtain the above within the time period set forth herein, or said contingency is not waived by Purchaser, then and in that event, at the option of Purchaser, on written notice to the other party, this Agreement may be terminated and upon such termination, there shall be no further liability one party to the other except the return of the deposit money paid hereunder.

There was no further provision concerning the payment of the balance of the purchase price.

The closing was fixed for August 1, 1977, requiring the seller to convey good and marketable title by bargain and sale deed with covenants against grantor's acts, "free and clear of mortgages" except as specifically set forth in the contract. The purchaser under the terms of the contract was Gandria Realty, Inc. Subsequently the contract was assigned by Gandria Realty, Inc. to Laurel Gardens Associates, a partnership. Plaintiff's attorney acted for the purchaser.

Under date of July 26, 1977 Dechtman wrote to the United States Savings Bank requesting that the bank agree to a transfer of the mortgage to the new owners. Under date of August 11, 1977 the bank advised the purchaser that it would not consent to a transfer of title. By a letter dated August 16, 1977 purchaser's attorney wrote to the United States Savings Bank asking for a statement of the balance of the mortgage as of August 31, 1977 and a *per diem* rate thereafter. In his letter he stated: "I assume that in submitting this statement in view of your refusal to consent to a transfer, no prepayment fee will be included therein." By letter dated August 19, 1977 the bank advised purchaser's attorney that it would not provide the

pay-off figure because the loan was closed for seven years. Thereafter the bank reconsidered and under date of September 7, 1977 advised the attorney that it would waive the closed period of seven years and accept prepayment with a penalty of 4% of the unpaid balance. The bank offered to provide a final statement on the amount due if its proposal was acceptable to the purchaser. On October 4, 1977 purchaser's attorney confirmed telephone conversations on September 30 and October 3 that the purchaser waived the contingency concerning the approval of the transfer by the United States Savings Bank. The purchaser had made inquiries about a mortgage commitment and had received an offer July 19, 1977 from Empire Savings Bank. The commitment would have cost $22,000 plus an additional prepayment of $22,000. That offer was withdrawn August 25, 1977 with a possibility that the savings bank would reconsider.

The closing was fixed for November 9, 1977. The purchaser had available a check for $275,000 and there was at the closing a form of deed and second mortgage. Zito refused to close because the purchaser has not obtained the approval of the bank for the transfer so that the purchaser could take subject to the existing mortgage, nor did the purchaser have a mortgage commitment that would provide funds to pay off the then existing first mortgage.

The trial judge found that there was no closing because Zito insisted upon a commitment for the balance of the purchase price over and above the cash to be paid and the mortgage to be given to him. He held that nowhere in the contract was the purchaser required to procure a commitment and that the requirement of a commitment had nothing to do with the contract. He therefore concluded that judgment should be entered in favor of the buyer for specific performance with the closing to take place within 30 days. All parties raised objections to the oral decision primarily because it was not complete. At a subsequent hearing the trial judge expanded his holding. He stated that the parties contemplated that "the buyer was going

to take on U.S. Savings and try to force U.S. Savings to extend that mortgage to them, at least permit them to continue to pay under it and, in the event that they did not, they were going to bring it to a legal conclusion and test the issue." He further stated that his order:

> ... [S]hould provide that in the event a foreclosure proceeding is instituted by U.S. Savings you [seller] can apply to this court for an order upon such terms as are just to require the purchaser to enter into some agreement or financing arrangement as approved by the court that would protect you, in the event they lose the question, they lose the issue, of taking subject to the U.S. Savings mortgage. Now, I can attempt to think of a lot of things. I can make them buy a standby commitment. The court can make them go out and purchase, as Mr. Dixon testified, I believe, there is a market for these things, can make them do a lot of things. I can make them put up a bond. I can make them pledge personal security. I can make them do a lot of different things, but I think you are entitled when you want it, but you've got to show me more than, you know, "we would like to have it." You are going to have to show me some real contact that put you in jeopardy, because your second mortgage that you are going to take back would at least, facially, appear to be accelerated by them defaulting or foreclosing—that is going to be interesting, because they are not going to be in default. They are going to keep tendering money to U.S. Savings. U.S. Savings is going to have to declare a defalcation. Now, the defalcation is not going to be the failure to pay the mortgage, it is going to be the refusal to accept the money, is the way I understand the scheme of it.
>
> I think that you are going to have to provide that the mere fact that litigation ensues between U.S. Savings and the purchaser here does not cause, as long as you are getting paid, does not cause acceleration or defalcation of your mortgage, but does permit you to come into court and participate in that foreclosure proceeding and to require or to request the court to require that the buyer, who would then be the owner, do such things as are necessary to protect and secure your second subsequent lien.

The judge further found as a fact that there was a fight anticipated between the buyers and U.S. Savings Bank which, if it resulted in foreclosure proceedings being instituted by U.S. Savings, would not be contemplated by the parties as accelerating or defaulting on the second mortgage.

 Specific performance is a discretionary remedy resting in equitable principles. *Stehr v. Sawyer*, 40 *N.J.* 352, 357 (1963). The remedy is not available unless the contract is certain as well as fair and just in its terms and enforceable without hardship to either party. *Alnor Construction Co. v. Herchet*, 10 *N.J.* 246, 249 (1952). In that case the court stated:

Equity requires a greater degree of certainty in the terms of an agreement submitted for specific performance than is necessary to sustain an action at law for damages. An action at law is founded upon the mere nonperformance by the defendant, and this "negative conclusion can often be established without determining all the terms of the agreement with exactness. The suit in equity is wholly an affirmative proceeding. The mere fact of nonperformance is not enough; its object is to procure a performance by the defendant, and this demands a clear, definite, and precise understanding of all the terms; they must be exactly ascertained before their performance can be enforced." *Pomeroy's Specific Performance of Contracts* (3d ed.), section 159. [at 250–251]

In *Moore v. Galupo,* 65 *N.J.Eq.* 194 (Ch. 1903), the contract provided in part that the balance of $44,000 was to be secured by "mortgage or mortgages" bearing interest at 6% a year. In holding that this provision was too indefinite to enable specific performance, the court said that both parties had to come to one mind as to this matter before the contract could be enforced. The court said that to impose specific performance would be to impose upon one party or the other the acceptance of a term which was not finally agreed upon in their dealings and not expressed in their agreement. In short, the complainant asks the court both to make a contract and decree its enforcement, said the court (at 205).

■ Our task in reviewing the findings of a trial judge is to determine whether the findings made could reasonably have been reached on sufficient credible evidence present in the record. *State v. Johnson,* 42 *N.J.* 146 (1964).

But if the appellate tribunal is thoroughly satisfied that the finding is clearly a mistaken one and so plainly unwarranted that the interests of justice demand intervention and correction . . . then, and only then, it should appraise the record as if it were deciding the matter at inception and make its own findings and conclusions. [at 162; citations omitted]

*See Middlekauff v. Middlekauff,* 161 *N.J.Super.* 84, 90 (App.Div. 1978); *State v. Elysee,* 159 *N.J.Super.* 380, 391 (App.Div.1978).

There is absolutely no support in the record for the finding that the parties contemplated that the buyer was going to take on the United States Savings Bank and try to force that bank to extend the mortgage to them, even to the point of litigation. The purchaser did not even know until long after the contract

was signed that the United States Savings Bank would not approve the transfer. The record shows very clearly that from the very beginning Zito's intention was that Sidpaul was to have a right to get out of the contract if the United States Savings Bank did not approve of the transfer or if without approval its mortgage was not paid off. He changed every contract submitted to him to indicate his desire. He obviously felt that the change in paragraph 11, together with the provision that the purchaser would pay $3,275,000, was sufficient to accomplish his intention.

The critical deficiency in the contract is the omission of any provision concerning the balance of the purchase price, an amount in excess of $2,000,000, after the cash payments and the execution and delivery of the second mortgage. It will be recalled in this regard that the seller was obligated to convey "good and marketable title ... free and clear of all mortgages ... except as specifically set forth herein ...." Clearly, the parties did not contemplate the satisfaction of the mortgage at the time of closing, since they were aware that it was "closed" until August 1979. The purchaser was not obligated by the contract to furnish a replacement mortgage and, indeed, could not have done so because of the pay off restriction in the first mortgage. A contract for the sale of real property may provide that the purchaser shall take subject to the existing mortgage or shall assume the mortgage and agree to pay it. But the inclusion of such terms here would necessarily have been dependent upon the first mortgagee's consent to the transfer of ownership. However, there were no alternate provisions in the contract for the balance of the purchase price if such consent were withheld, as was done here. The contract is silent on how the first mortgage was to be dealt with if the mortgagee refused to approve the transfer. It is incredulous that Zito would enter into a contract under the terms of which the second mortgage that his corporation was taking for $800,000 would be put in jeopardy, placing his corporation in danger of losing the balance of the purchase price. The omission of a provision

detailing the manner in which the balance of the purchase price was to be paid or otherwise attended to causes the contract to be unenforceable. The contrivances of the trial judge trying to provide for what was omitted from the contract is ample proof that this contract could not be specifically enforced.

Our dissenting colleague comments that "a broad array of equitable remedies are available to stifle this possibility" if a foreclosure by the first mortgagee should culminate in "enabling the purchaser unjustly to evade payment of the balance of the purchase price." He further comments that some of these remedies were enumerated by the trial judge in the judgment. We know of no way, as this contract is written, by which the purchaser could be forced to pay the balance of the purchase price, nor does the judgment so provide. While the purchaser is enjoined in the event of a declaration of default or foreclosure proceeding by the first mortgagee to continue to tender the monthly payments and to contest actively any action by the bank to invoke and enforce the due-upon-sale clause, the judgment accords the seller only the privilege of applying to the trial court here "for an order on such terms as are just and reasonable under the circumstances regarding safeguards in the event the purchasers are unsuccessful in the foreclosure proceeding if and when the same is instituted." With due deference to the rationale of the trial judge and to the views expressed in the dissenting opinion, this portion of the judgment does not supply that which the contract lacks, namely, a binding and enforceable obligation on the part of the purchaser with respect to the balance of the purchase price.

A contract which omits a definite obligation for the performance by each party thereto is incapable of remedy in equity or at law. *Cf. Hux v. Raben*, 74 *Ill.App.*2d 214, 219 *N.E.* 2d 770, 774 (App.Ct.1966), aff'd 38 *Ill.*2d 223, 230 *N.E.*2d 831 (Sup.Ct.1967). An essential characteristic of an enforceable contract is that its obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was

promissor undertook to do. *Malaker Corp. v. First Jersey Nat'l Bank*, 163 *N.J.Super.* 463, 474 (App.Div.1978), certif. den. 79 *N.J.* 488 (1979). No action at law can be recovered upon by either party. *Cf. Heim v. Shore*, 56 *N.J.Super.* 62 (App.Div.1959). Therefore, none of the defendants are entitled to prevail on their cross-claims.

In view of the fact that no title was passed, plaintiff is not entitled to a commission. *Ellsworth Dobbs, Inc. v. Johnson*, 50 *N.J.* 528, 548 (1967).

The judgment is reversed and the matter remanded for the entry of judgment:

(1) For defendants on the complaint of plaintiff.

(2) For defendants Sidpaul, Paul Zito and Rosalie C. Zito on the cross-claim of Gandria Realty, Inc. and Laurel Gardens Associates.

(3) For Laurel Gardens Associates on the cross-claim of Sidpaul, Paul Zitto and Rosalie C. Zito.

(4) Return to Laurel Gardens Associates of the $25,000 paid by reason of the signing of the contract without interest.

ANTELL, J. A. D. (dissenting).

I disagree that this contract is too uncertain to be enforced in equity. It provides for a purchase price of $3,275,000 to be paid $300,000 in cash and by execution of a purchase money second mortgage for $800,000. The first mortgage on the property held by the United States Savings Bank was always in the minds of the parties and is mentioned at least three times in the contract. The balance owing thereon of approximately $2,175,000 represents the remainder of the purchase price.

The majority reasons that the failure to specify how the first mortgage "is to be dealt with" results in the omission of an essential term. To my mind it does not.

... [I]t is not necessary for a writing to contain every possible contractual provision to cover every contingency in order to qualify as a completed binding agreement. See 1 *Corbin, Contracts*, § 95 (1963); *United States v. City of New*

*York,* 131 *F.2d* 909 (2 Cir. 1942), *cert.* den., 318 *U.S.* 781, 63 *S.Ct.* 838, 87 *L.Ed.* 1149 (1943). Some of these issues may be determined by the operation of law, or the parties may resolve such differences by subsequent agreement, or a contract may be silent in those respects. In any event, a contract is no less a contract because some preferable clauses may be omitted either deliberately or by neglect. So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound. Such is the just and fair result. See 1 *Corbin, Contracts,* § 95 at 400 (1963); *Volk v. Atlantic Acceptance,* 139 *N.J.Eq.* 171 (Ch. 1947); *Lind v. Schenley,* 278 *F.2d* 79, 86 (3 Cir. 1960). [*Berg Agency v. Sleepworld-Willingboro, Inc.,* 136 *N.J.Super.* 369, 376–377 (App.Div.1975)]

*See, also, Paley v. Barton S. & L. Ass'n,* 82 *N.J.Super.* 75, 83 (App.Div.1964), certif. den. 41 *N.J.* 602 (1964).

The contract before us clearly demonstrates the parties' "intention to be bound." Whatever questions there may be as to the details of their understanding can be answered almost as a matter of mechanics.

It is obvious that paragraph 11 is intended to protect the purchaser from having to perform without first obtaining needed financing, an understanding which runs through all three drafts of the agreement. Its terms may be waived only by the purchaser, and if they are waived it follows, even though not expressly stated, that the sale will be subject to the lien of the first mortgage. If the first mortgagee decides to accelerate and declare the balance due, the purchaser will then have to pick among available alternative responses. It could obtain financing elsewhere and liquidate the accelerated balance, or it might challenge the mortgagee's right to accelerate. In the latter case the mortgagee could declare the mortgage in default and the rights of the parties would be resolved under equitable principles relevant to the issues as they may then be framed. But this is substantially the same situation which would exist if in fact the purchaser had expressly assumed the mortgage with the first mortgagee's approval and then defaulted in payments. In both cases the balance of the purchase price is paid by relieving the seller of the duty to clear the first mortgage and in both cases the perils of foreclosure are the same to each of the parties.

By providing in paragraph 11 that the sale is subject to the "approval" of the first mortgagee, the parties left no doubt that the purchaser was to be permitted to pay off the balance by assuming the monthly mortgage payments, if agreeable to the mortgagee. The only departure from this expectation which I can envision under the present circumstances is that the purchaser may now be required to pay the entire balance still due under the mortgage or face foreclosure of both mortgages and the loss of its $300,000 investment. This possibility is a burden which the purchaser is apparently willing to accept and furnishes no justification for nonperformance by the seller.

But these clearly foreseeable contingencies are neither here nor there; they have nothing to do with the essential terms of the contract. Nor does the fact that foreclosure of the first mortgage might have an adverse impact upon the purchase money second mortgage taken by the seller. These are all merely possible consequences of the purchaser exercising its expressly reserved right to waive the first mortgagee's approval as a condition of the sale. All of this could have been anticipated during negotiations and it is in light thereof that the parties must be deemed to have contracted.

It is presumed that the parties intended to make a binding and enforceable obligation and "as between two equally reasonable constructions the court should adopt the one which makes the contract valid as opposed to one reaching a contrary result." *Silverstein v. Keane,* 19 *N.J.* 1, 11 (1955); *G. Loewus & Co., Inc. v. Vischia,* 2 *N.J.* 54, 58 (1949). As the Supreme Court stated in *New Jersey Bank v. Palladino,* 77 *N.J.* 33 (1978):

> ... Terms will be implied in a contract where the parties must have intended them because they are necessary to give business efficacy to the contact as written. *Renee Cleaners, Inc. v. Good Deal Super Markets of N.J., Inc.,* 89 *N.J.Super.* 186, 190 (App.Div.1964). There is the strongest reason for interpreting a business agreement in the sense which will give it legal support. *Silverstein v. Keane,* 19 *N.J.* 1, 11 (1955) ... Such a construction accords also with the proposition that when the terms of an agreement have more than one possible interpretation, by one of which the agreement would be valid and by the other void or illegal, the former will be preferred. 3 *Corbin, Contracts,* § 546 at 170 (1960); *Kelly v. Guarantee Trust Co.,* 114 *N.J.Eq.* 110, 115 (E. & A. 1933); *G. Loewus & Co. v. Vischia,* 2 *N.J.* 54, 58 (1949). [at 46]

The contract occupied the attention of the parties from February 14, 1977 to June 7, 1977. Three drafts were prepared by the lawyers for consideration by the parties, with particular attention given to the purchaser's rights under paragraph 11, and the final draft represents their studied decision as to how they wanted this handled. That during negotiations Dr. Zito expressed his desire "that Sidpaul was to have a right to get out of the contract if the United States Savings Bank did not approve of the transfer" tells us only that the point was not overlooked and that the written provision reserving this right to the purchaser alone was bargained for and was not inadvertent. Furthermore, the fact that the majority finds it unbelievable that Dr. Zito would agree to this should not affect our deliberation. What matters is that he did agree to the contract as written. There may have been business and personal factors involved which furnished his incentive to make this concession about which we know nothing and should not speculate.

I see no alternative but to conclude that the parties intended the $2,175,000 balance to be satisfied by relieving Sidpaul of the obligation to liquidate the first mortgage; that the purchaser was to take subject thereto and be left free to deal thereafter with the first mortgagee. There is no reason why this understanding cannot be enforced. In order to deny specific performance for the reason given by the majority the uncertainty "must be so great as to prevent the existence of a contract." *Fountain v. Fountain*, 9 *N.J.* 558 (1952).

... If there be sufficient expressed to constitute "a legally valid contract," a court of equity can make certain by its decree, within reasonable limits, subordinate details of performance which the contract itself does not express. [at 566 citing *Williston on Contracts* (rev. ed.), § 1424]

If it is suggested that the events of a foreclosure proceedings may culminate in enabling the purchaser unjustly to evade payment of the balance of the purchase price, I can only observe that a broad array of equitable remedies are available to stifle this possibility. Some of these, as the majority notes, were enumerated by the trial judge and one was, in fact, made a part

of the judgment but was objected to and brought up for review by the seller on the ground that the introduction of this safeguard for its own protection constitutes a rewriting of the contract.

*Moore v. Galupo*, 65 *N.J.Eq.* 194 (Ch. 1903), relied on by the majority, is distinguishable. There the balance of an agreed purchase price was to be paid by a "mortgage or mortgages," about which nothing more was said except that they were to bear interest at the rate of 6%. Nothing was said about the term of the mortgages, how many there should be, whether concurrent or successive, the order of precedence between them, the amount of frequency of payments or any other provisions thereof. For the court to enforce that contract would require it to decide what terms the mortgage or mortgages would contain and thus to create for both parties a contract which, in its essentials, they had never agreed upon, and it was this which the court refused to do.

I would affirm the judgment of specific performance.